## HALLENBORG v. COBRE GRANDE COPPER COMPANY..

APPEAL FROM THE SUPREME COURT OF THE TERRITORY OF ARIZONA.

No. 87. Argued November 29, December 1, 1905.—Decided January 8, 1906.

This was a minority stockholder's suit to set aside a contract made for the sale of a large block of stock of the corporation under an arrangement made by the respective owners thereof with the party making the sale who was also president, of the corporation. The contract was ratified by a majority of the stockholders and by the directors but against complainant's protests. It contained provisions for payments to the president for services. Complainant charged fraud, alleged a conspiracy between the president and the purchaser and asked for a receiver and an accounting. Other suits were brought in other courts in which similar charges were made. *Held*, that:

On the record of this case the charges of fraud were not sustained and the complaint was not established.

Where the allegations in the suit in which fraud is alleged are held to be untrue, records of other suits in which like charges were made and sustained on *ex parte* statements cannot be regarded as evidence of the fraud.

THIS is a minority stockholder's suit. It was brought originally by Axel W. Hallenborg as owner of 8,617 shares of the Cobre Grande Copper Company, an Arizona corporation, and also as creditor of that corporation, for advances to the amount of $50,005. The appellant Addicks owned 5,000 shares and was allowed to intervene at the trial, and adopted Hallenborg's complaint.

In November, 1898, defendant (appellee) Greene owned certain mining properties in Sonora, Mexico, and had an option on other properties. He gave an option on these properties to defendant Mitchell. It was provided in the option that $12,500 should be paid in cash and $237,500, as follows: $37,500 on or before November 26, 1899; $100,000 on or before November 26, 1900; $100,000 on or before November 26, 1901.

In April, 1899, Greene, Mitchell and other parties, under the laws of Arizona, organized the Cobre Company. One hundred and ninety-nine thousand nine hundred and ninety-five shares of the stock were turned over to Mitchell in consideration of his option from Greene, which option was assigned to the Cobre Company subject to Greene's rights. The Cobre Company went into possession and was in possession in September, 1899. In October of that year controversies arose between Greene and the company over the option and the right to possession of the properties, and Greene entered into possession of them. Thereupon the company instituted suits in the courts of Mexico to gain possession of the properties, and also instituted a suit in the District Court of Maricopa County, Arizona, to restrain the delivery to Greene of the deeds which were put in escrow under the contract with Mitchell, which had been assigned to the Cobre Company. In the latter suit an injunction was granted restraining Greene from demanding or receiving the deeds. A suit was also brought in New York and one in Texas to recover the product of the mines. In the suit in Arizona the Cobre Company alleged, among other things, in substance, all the facts set forth in paragraph three of the original complaint in the present suit, and prayed that Greene be required to account for the proceeds of the products of the mines and other property alleged to have been appropriated by him. Issue was joined by the defendants therein, the case tried and a judgment entered dismissing the complaint. The judgment was not appealed from. At the time of the judgment the plaintiffs were stockholders of the Cobre Company.

While the litigation was pending the stockholders of the Cobre Company, or a majority of them, comprising stockholders to the number of 115,049 shares, entered into a pooling arrangement, whereby all of their stock was delivered to defendant Gage, with power to vote the same at all meetings of the stockholders. Subsequently Gage was granted the right to dispose of and sell the stock at his discretion. Several attempts were made by Gage to sell the stock at $2.50 a share, which

failed on account of the other contracting parties not complying with their contracts. The plaintiff Hallenborg and John H. Costello opened negotiations with Gage for the stock at $2.50 a share. This also failed on account of objection by Costello to the contract which was drawn, although negotiations were kept up until December, 1900. Then Gage opened negotiations with Greene, who offered to buy the stock, upon better terms than anybody else had offered. Gage consulted the directors and they urged him to enter into a contract with Greene. The stock represented by Gage represented the entire stock of the company, including Hallenborg's 8,000 shares, except that owned by Greene and his associates and about 6,500 shares owned by other parties. Gage entered into a contract with Greene, December 12, 1900, and it was ratified in its entirety by the directors and by a majority vote of the stockholders. Hallenborg was present by attorney at the meeting and protested against the ratification. The contract was complied with by Greene and he paid the full purchase price for the shares, and they were delivered to him and the Greene Copper Company. All of the stockholders accepted the money so paid except Hallenborg, who returned the money sent to him and declined to be bound by the contract.

The court finds that the contract was made with Greene in good faith, with full knowledge and consent of the directors and upon the advice of counsel of the Cobre Company, that the company could not successfully maintain the suit brought in Arizona, and with the full belief on the part of Gage that the contract was for the best interest of the company and its stockholders. And the court further finds that no agreement was made between Gage or other persons, whereby the directors, Adamson, Wood, O'Keefe, or any of them, were to derive benefit or did derive any benefit whatsoever, except such as they derived from the sale of their stock.

The contract of December 12, between Gage and Greene, provided for the payment of the stock in certain instalments. Greene was to pay to Gage $25,000 in cash in addition to the

$2.50 per share, and also to pay to Gage $30,000, and in addition 3,000 shares of the capital stock of the Greene Consolidated Copper Company, or, in lieu thereof, $30,000 in cash. Gage was given the privilege of taking, instead of $2.50 per share for shares of stock in the Cobre Company; stock in the Greene Consolidated Copper Company—four of the former for one of the latter—the option to be exercised before payment of the second instalment on the stock of the Cobre Company. Five thousand shares of the Greene Consolidated Copper Company were provided to be paid to Gage for his own use and benefit, and 5,000 shares for the use and benefit of L. H. Chalmers, Baker & Bennett, and Herndon & Norris, attorneys at law in Arizona.

It was also agreed that a certain promissory note given by J. H. Costello to the Cobre Company, amounting to $23,000, was to be surrendered to Costello. This note was conditioned upon the Cobre Company obtaining possession of its property in Mexico, and was not to be paid until ninety days after such recovery. It was also agreed that the suits brought by the Cobre Company in New York, Texas, and Arizona should be dismissed. The other provisions of the contract are but incident to those before given and may be omitted. The suits in New York are still pending. All the other suits were dismissed or otherwise disposed of by final judgment prior to this suit. The $25,000 mentioned in the contract of December 12 was for the purpose of taking up and discharging certain notes due by the Cobre Company. It was so paid. The $30,000 mentioned was to be and it was turned into the treasury of the company to pay its debts. The 3,000 shares in the Greene Consolidated Company, or the alternative $30,000, was also for the purpose of paying the debts of the Cobre Company outside of the $25,000 before mentioned. It was paid into the treasury. The 5,000 shares of stock in the Greene Consolidated Company was intended by all parties as compensation to Gage as president of the Cobre Company, and for the time, labor and trouble given to the company's business, and for

money advanced for it and expenses paid in attending to its affairs. Instead of shares, as provided, a cash payment of $50,000 was made to him. The shares paid to Chalmers and Baker & Bennett and Herndon & Norris were intended to be paid as compensation as attorneys for the company for their services in various litigations. Instead of the shares a cash payment of $50,000 was made, and it is found that their services were reasonably worth that sum. The note against Costello was surrendered to him.

The court also finds that the only property in possession of the Cobre Company within the jurisdiction of the court is the money paid into the treasury of the company in pursuance of the contract of December 12. And, finally, the court finds "that the temporary restraining order granted in this action, enjoining the defendants from carrying out the terms and provisions of the contract of December 12, 1900, and dismissing any and all of the actions then pending in behalf of the Cobre Grande and enjoining defendant Phœnix National Bank from delivering up any of the papers and documents held by it in escrow, evidencing the title held by the Cobre Grande Copper Company in and to the mining property described in the complaint, was modified, and the part of it enjoining the Phœnix National Bank was dissolved upon the ground that the District Court in and for Maricopa County had rendered its decision in the suit of the Cobre Grande Copper Company against Greene and others adversely to said Cobre Grande Copper Company, and that as a part of the judgment of said court the Phœnix National Bank was commanded to deliver up said papers and documents to said defendant Greene, and that as this case now stands there is nothing before the court except an application for the appointment of a receiver."

*Mr. Albert B. Cruikshank* for appellant.

*Mr. Aldis B. Browne,* with whom *Mr. Eugene S. Ives, Mr. Ben Goodrich, Mr. Alexander Britton* and *Mr. Norton Chase* were on the brief, for appellees.

Mr. Justice McKenna, after stating the case as above, delivered the opinion of the court.

Both of the lower courts held that the suit had become one for the appointment of a receiver. The Supreme Court said: "The purpose for which a receiver is asked is twofold so far as the record is concerned: First, that he may take charge of the property of the company; second, that he may prosecute its litigation." After some comment the court further observed that the District Court was well within the exercise of a sound discretion in refusing to appoint a receiver, and "that there was not any other relief which the court could properly grant the plaintiffs in the action." We do not find it necessary to decide whether, if plaintiffs' complaint were true, they would not be entitled to greater relief than the appointment of a receiver. We rest our judgment on the merits. In other words, we think the complaint has not been established.

The complaint charges a conspiracy between Greene and Mitchell, being at the time directors of the Cobre Company, to deprive the company of its mines and property and acquire it for themselves, and that in pursuance of the conspiracy they took possession of the company's property. No evidence was offered in the present suit to sustain the charge. Records of suits in which like charges were made cannot be regarded as such. The complaint also charges the contract of December 12, 1900, to be a "fraudulent and corrupt contract and conspiracy of Greene with Gage and other directors of the Cobre Company, to stop the litigation against defendants and to secure to them the undisputed possession of the mines" from which the Cobre Company had been evicted. Both of the lower courts found against the charge. They found that Gage entered into the contract with the knowledge of the directors of the Cobre Company, and in good faith, upon the advice of counsel of the futility of further pursuing the litigation against Greene, and in the belief that "the contract was to the best interest of said company and its stockholders." It may be admitted that

Greene's purpose was to stop the litigation against him and quiet his possession of the property, but we cannot assume from this that he was guilty of fraud in making the contract of December 12, or that it was part of a conspiracy with the directors of the Cobre Company to deprive the company of its property. Therefore any fraud in fact is out of the case.

Plaintiffs, however, contend that the contract is fraudulent on its face, and that it was decided so to be by the Appellate Division of the Supreme Court of New York in *Hallenborg* v. *Greene,* 66 App. Div. N. Y. 590. The pleadings are not set out in the report of the case. We may assume, however, that the complaint was in most part as that in the case at bar.

The case went to the Appellate Division of the Supreme Court on an appeal from an order granting a preliminary injunction and appointing a receiver. It was heard on the complaint and affidavits of the plaintiff. The affidavits of the defendants were by stipulation omitted from the record. Upon the showing thus made the court said:

"According to the complaint and affidavits the Cobre Company was not only a solvent corporation, but its assets were exceedingly valuable; and through conspiracy, fraud and bribery the defendants Greene and Mitchell have obtained the management and control thereof to further their own schemes, in hostility to the interests of the other stockholders, and have actually obtained a contract from the Cobre Company to transfer to these rival companies controlled and managed by Greene and Mitchell all its property and property rights, without even a nominal consideration. This fraudulent contract was being consummated with dispatch at the time of the commencement of this action and the granting of the injunction herein. These allegations must be taken as true for the purposes of this appeal, and it is evident that the inevitable consequence will be, not only that the stock of the Cobre Company, of which the plaintiff is a large holder—owning one twenty-fifth of the entire capital stock—will be rendered worthless, but that there will

be no assets with which to pay the claims of creditors, of whom, also, the plaintiff is one for a substantial amount.

"It needs no refinement of the decisions to show that the cause thus presented is one for equitable cognizance."

The allegations of the plaintiff were taken to be true, and being so taken the comments of the court may claim justification. In the case at bar the allegations of the complaint, as far as they are passed on, are found to be untrue. The opinion of the Appellate Division, therefore, is of no value to plaintiffs' contention.

We are remitted, therefore, to the contract of December 12. What fraudulent element is there in that? It disposed of the shares of the stockholders and it secured the payment of money to the corporation; it settled controversies which, as far as appears, the company had no means of prosecuting, and which, wherever they were tried, had been decided against the company, and where not decided, in the opinion of the company's attorney, would also be decided against the company. We may assume that the stockholders knew or could estimate the value of the properties. They deposited their stock with Gage to sell, became, indeed, impatient at his delay. We may assume the price of the stock reflected the value of the properties—Hallenborg bought his shares at $2.50. He had an option upon all that were in Gage's hands at that price. He let the option lapse, although negotiation was kept up with him from October to December. Gage then turned to Greene, who, it is found, offered to purchase the stock on better terms than anybody else ever offered. And there was no concealment. Gage was urged by the directors of the company and a large majority of the stockholders to make the contract. It was subsequently formally ratified by the directors and by a majority vote of the stockholders at a stockholders' meeting.

But there were three other elements from which plaintiffs deduce fraud. Gage was given $50,000, as compensation as president of the Cobre Company and other services and expenses paid by him; the attorneys of the company were paid

$50,000, for legal services, and there was surrendered to Costello the note which he owed the company. There was no secrecy about these items, and it is manifest from the findings and the evidence that they constituted no inducement to the contract. Whether Gage can be compelled to pay to the Cobre Company the money received by him we need not decide. Its receipt by him did not make the whole contract fraudulent. It did not take from the stockholders the power to sell their stock, nor from the directors of the company the power to control the litigation in which the company was involved, to abandon that litigation or to compromise it. In the exercise of their power they could have done those things directly. It was a matter of form and procedure that it was done in the manner provided by the contract of December 12.

It is deceptive to call or regard the action of the directors as a transfer of the property of the corporation without consideration or for an inadequate consideration. The company had only a right to purchase the property, the conditions of which it had not fulfilled. It claimed legal excuse and brought suits against Greene, but that it had legal excuse was disputed, and seems to have been doubted by all who were interested in the property but the plaintiffs. A jury in Texas had decided against the excuse; and the court in Arizona has also done so. That the latter was subsequent to the contract of December 12 does not militate against it as proof of good faith of the settlement.

This view of the merits of the case renders it unnecessary to pass upon the contention of the defendants that a court of equity has no inherent power, in the absence of statutory authority, to appoint a receiver upon the application of a private person under the circumstances presented by the complaint.

There are assignments of error upon the rulings of the trial court on the admissions of testimony, oral and documentary, which we do not think call for discussion. It is enough to say that they are not well taken.

There is also an assignment of error upon the refusal of the Supreme Court to make certain findings of fact. We think the findings made substantially cover those proposed, certainly to the extent necessary to the case as we have considered it.

*Judgment affirmed.*