## CAROLINA COAL AND ICE COMPANY v. SOUTHERN RAILWAY COMPANY.

(Filed 27 May, 1907).

1. **Removal of Causes—Diverse Citizenship—Purchasing Company— Domestic Corporation—Statute.**—Where the language of the statute manifests a clear intention to create a new corporation, and not to license or permit an existing foreign corporation to exercise its power in the State, and such act of creation is accepted, a domestic corporation is created. A suit cannot be removed from the State to the Federal Court upon the ground of diversity of citizenship by a corporation of another State which became the purchaser of a corporation of this State under a sale made pursuant to a deed of trust or mortgage, by virtue of The Code, sec. 697, providing upon the conveyance being made to "the purchaser, the said corporation shall *ipso facto* be dissolved and the said purchaser shall forthwith be a new corporation, by any name which may be set forth in the conveyance," etc.

(*Railroad v. Allison*, 190 U. S., 326, cited and distinguished).

2. **Same—Judicial Notice.**—The courts of this State cannot take judicial notice of the contents of a private statute of another State.

Motion for removal of cause to the Federal Court, heard by *Cook, J.*, at the February Term, 1907, of the Superior Court of Buncombe County.

Plaintiff, a North Carolina corporation, alleges: That the General Assembly of this State, at its session of 1854-'55, incorporated "The Western North Carolina Railroad Company," chapter 228, Private Laws 1854-'55. It sets forth several acts amending the charter of said company, the provisions of which are not material to the point presented upon this appeal. At the special session of 1880 (ch. 26) an act was passed authorizing a sale of the State's interest in the property, etc., of the said company. That pursuant thereto, the commissioners appointed for that purpose executed a deed to the purchaser, a copy of which is made a part of the complaint. That on 2 September, 1884, the said Western North

Carolina Railroad Company, pursuant to an act of the General Assembly, executed a second mortgage to the Central Trust Company of New York, conveying to said trust company all of its property, rights, privileges, franchises, etc., for the purpose of securing the payment of certain bonds, a description whereof is fully set out in the said mortgage. That thereafter, in a suit of equity in the Circuit Court of the United States for the Western District of North Carolina, wherein the said Central Trust Company of New York was complainant and the Western North Carolina Railroad Company and another were defendants, a decree was passed directing a foreclosure of said mortgage and sale of the property, franchises, etc., of the said railroad company, and appointing Charles Price, Esq., Special Master to make sale of said property conveyed in said mortgage. That said Price, Special Master, pursuant to said decree, made a sale of said property, etc., when the Southern Railway Company became the purchaser. That said sale was duly confirmed and the said Special Master directed to make title to the purchaser. That, pursuant thereto, the said Charles Price, Special Master, on 22 August, 1894, executed and delivered to the Southern Railway Company a deed conveying, assigning and setting over to the said railway company all of the property, franchises, etc., of the said Western North Carolina Railroad Company conveyed in said mortgage. That defendant, the Southern Railway Company, under and by virtue of the said deed, has continuously held and used the tangible property, operated the line of railway and exercised and enjoyed all and singular the rights, powers, privileges, franchises and immunities granted and conveyed in said deed.

That plaintiff is advised, informed and believes, and so avers the fact to be, that, by reason of the matters and things set forth and by virtue of the laws of the State of North Carolina, said defendant, the Southern Railway Company, became

and was the successor of the Western North Carolina Railroad Company, and that said defendant, as such successor, became, was and is a corporation created and existing under and by virtue of the laws of the State of North Carolina, and is a citizen of the State of North Carolina. The plaintiff proceeds to set out the facts upon which it bases its prayer for relief against the defendant corporation, which, in view of the question presented upon the appeal, it is not necessary to set out. The Southern Railway Company, within the time permitted, files its petition for a removal of the cause to the Circuit Court of the United States. The petition sets out that the Southern Railway Company was, at the time of the commencement of this suit, and still is, a corporation originally created, organized and existing under and by virtue of the laws of the State of Virginia, and is now, and was at the commencement of this action, a citizen of the State of Virginia and of no other State, etc., all of which is in strict accordance with the statute prescribing the procedure for removal of causes from the State into the Federal courts on account of diverse citizenship. The Court, upon the petition, ordered the cause to be removed in accordance with the prayer of the petitioner. Plaintiff excepted and appealed.

*Frank Carter* and *H. C. Chedester* for plaintiff.
*Moore & Rollins* for defendant.

CONNOR, J., after stating the case: The record, upon which alone this appeal is to be decided, presents an anomalous condition. The plaintiff sues what it asserts to be a North Carolina corporation, setting forth at length the legislative and judicial process by which it is created. It further alleges that this domestic corporation is now and was at the time of committing the injuries complained of and threatened, for which it seeks redress and injunctive relief, the owner of and operating a railroad, with all of its property, franchises and

privileges, etc., from Salisbury to Paint Rock, in this State. It further alleges that this corporation was created, in the manner set forth, by the Legislature of this State, by the name of the Southern Railway Company. Process is returned served on the "freight agent of the Southern Railway Company at Asheville, N. C."

Thereupon, a corporation of the same name, alleging itself to be and, for the purpose of this appeal, to be so taken, a Virginia corporation, comes into court and files a petition for removal of the cause into the Circuit Court of the United States, averring that, plaintiff being a citizen of North Carolina, there exists what, for the purpose of removal, is termed "diverse citizenship." The plaintiff insists that, conceding the existence of a corporation having its domicile or origin or creation in Virginia, by the name of the Southern Railway Company, such corporation, in respect to the line of railway formerly known as the Western North Carolina Railroad, with its franchise, has no existence or status in this State. That said railway, franchises, etc., are the property of the defendant and is operated by the Southern Railway Company, a corporation created by the Legislature of North Carolina. If the contention of the plaintiff be true, the Southern Railway Company, the Virginia corporation, is not a party to this action and has no standing in court for any purpose. If such contention is not true, it would seem that the same result follows. The plaintiff insists, and its complaint avers, that it is suing a North Carolina corporation. The return of the service of the summons does not indicate of which corporation the "freight agent of the Southern Railway Company at Asheville" is the local agent. It would seem, in this state of the record, the plaintiff has sued one corporation and another corporation of the same name has come into court. If, as assumed by the petitioning corporation, the Southern Railway Company, the Virginia corporation, is the owner of

the property, franchises, etc., formerly owned by the Western North Carolina Railroad Company, no judgment in this action would affect it or its property. Passing this phase of the question, however, we will, as the appeal and the argument invite us to do, consider the case upon its merits.

The first question presented for examination is whether, upon the facts alleged in the complaint, there is a corporation created by and existing pursuant to the laws of this State by the name of the Southern Railway Company. It is alleged in the petition, and for the purpose of this appeal conceded, that the petitioner is a corporation created by and existing pursuant to the laws of Virginia. We are not advised in regard to the extent of its power to acquire, own and operate railroads beyond the limits of its domicile of creation. The complaint sets out and makes part thereof the charter, with all of its amendments, of the Western North Carolina Railroad Company. An examination of the charter discloses that the corporation is empowered to construct and operate a railroad from Salisbury to certain points west of Asheville, in this State. The franchise, with the right of eminent domain, to take tolls, and other powers incident to railroad companies, is conferred upon the corporation. We also find that in 1880 the State parted with its interest in the corporation and its property. The effect of this statute (special session 1880, ch. 26) and the deed made pursuant thereto is passed upon by this Court in *Marshall v. Railroad,* 92 N. C., 322. Subsequent to and in pursuance of the powers conferred upon the assignees of the State a new corporation by the same name was formed, with enlarged powers, to provide for the completion and extension of the road by the issuing of bonds to be secured by mortgage, etc. It further appears from the complaint that two mortgages were executed to trust companies to secure bond issues, pursuant to the powers conferred. The Central Trust Company foreclosed the second

mortgage by suit in the Circuit Court of the United States, and at the sale the Southern Railway Company, "a corporation organized and existing under the laws of the State of Virginia," became the purchaser. At this point the question arises: Q. By what authority did this Virginia corporation become the purchaser of and assume to exercise the franchises, privileges and powers conferred by the Legislature of this State upon a domestic public-service corporation? That the franchise was sold and passed to the purchaser as indissolubly connected with and as a component part of the tangible property is settled beyond controversy. *Gooch v. McKee,* 83 N. C., 59. Section 697 of The Code of 1883, being the law in force at the time of the sale, provides what property shall pass to the purchaser by a sale made pursuant to a deed of trust or mortgage executed by a corporation, and further provides, "upon such conveyance to the purchaser, the said corporation shall *ipso facto be dissolved and the said purchaser shall forthwith be a new corporation,* by any name which may be set forth in the said conveyance, or in any writing signed by him and recorded in the same manner in which the conveyance shall be recorded." "The corporation *created by or in consequence of such sale and conveyance* shall succeed to all such *franchises, rights and privileges and perform all such duties as would have been, or should have been, performed by the first corporation but for such sale and conveyance."* The Code, sec. 698. The section proceeds to provide for the issuance of stock, etc. Section 2005 (Code, 1883) provides that, "when any railroad corporation shall be dissolved, or its property sold and conveyed under execution, deed of trust, mortgage or other conveyance, the owner or purchaser shall constitute a new corporation," etc. This section seems to contemplate the dissolution of the corporation by decree of the Court, and does not, we think, have any bearing upon the question before us. The necessity for the

144—47

statute, or, as we find in other States, one similar to it, is manifest. The sale of the entire property of a corporation, especially one the property of which is dedicated to a public use, severed from the franchise, would be of little or no value. The franchise, originally granted for the benefit of the public, gives value to the property, and by permitting it to pass with the property gives the corporation credit. By the sale of the property and franchise, keeping the corporation in existence, the purchaser becomes liable for the debts and liabilities. For the purpose of avoiding this and other results affecting its value, the statute, which is read into the decree of foreclosure, dissolves the old corporation, and a new corporation is "forthwith," by operation of law, created, succeeding to the franchise and assuming the duties, etc., of the dissolved corporation. It is manifest that if one or more individuals had purchased, at the sale of the Special Master, the statute, being read into the deed of conveyance, would have *quoad* the property and franchise so purchased *ipso facto* converted such purchaser into a new corporation. Does the fact that a corporation, created by and existing pursuant to the laws of another State, becomes the purchaser prevent the same legal result by operation of the statute? Unless the statute has this effect, by what authority does the Southern Railway Company, a Virginia corporation, own and operate a railroad in this State? Certainly the old corporation is dissolved. *Julian v. Trust Co.,* 193 U. S., 93. It does not appear that by its charter any power is conferred upon it to do so, and if it did so appear of course no such right could be exercised in this State without the consent of the State, granted by its Legislature, subject to such conditions as it saw fit to impose. *Paul v. Virginia,* 8 Wall., 168. In *Railroad v. Harris,* 79 U. S., 65 (81), it is said: "The company (complainant) was chartered to construct a road in Virginia as well as Maryland. The latter could not be done without

the consent of Virginia. That consent was given upon the terms which she thought proper to prescribe. With a few exceptions, not material to the question before us, the same powers, privilegess, obligations, restrictions and liabilities were granted as those contained in the original charter." We take it as well settled that it is within the power of the Legislature to prescribe the terms upon which a foreign corporation may come into the State, purchase and operate a railroad. It has been uniformly held that one State may make the corporation of another State, as there organized and conducted, a corporation of its own *quoad* any property within its territorial jurisdiction. *Railroad Co. v. Harris, supra; Railroad Co. v. Wheeler,* 1 Black, 297; *Clark v. Barnard,* 108 U. S., 436; *Railway Co. v. Louisville Trust Co.,* 174 U. S., 552.

Assuming that the language of sections 697 and 698 was incorporated into the decree of foreclosure and into the deed, and this, we think, the law does, what would have been the status of the purchaser? In *Clark v. Barnard, supra,* the facts, as stated by *Mr. Justice Matthews,* so far as applicable to the question under discussion, were: The Boston, Hartford and Erie Railroad Company was a Connecticut corporation. Power was conferred by its charter to purchase the franchise, etc., of certain other railroad companies. In pursuance of this power it purchased the franchise, etc., of the Hartford, Providence and Fishkill Railroad. This road was a consolidated corporation, deriving its existence from both Connecticut and Rhode Island. By a subsequent act of the Legislature of Rhode Island the sale and transfer of the Hartford, Providence and Fishkill Railroad was ratified and confirmed, with the provision that "the Boston, Hartford and Erie Railroad Company, by that name, shall and may have and use, exercise and enjoy all of the rights, privileges and powers heretofore granted and belonging to the said Hart-

ford, Providence and Fishkill Railroad Company and ·be subject to all the duties and liabilities imposed upon the same by its charter and the general laws of the State." The Court said that the Hartford, Providence and Fishkill Railroad Company was, so far as it owned and operated a railroad in Rhode Island, a corporation in and of that State, and the Boston, Hartford and Erie Railroad Company became its legal successor in that State as owner of its property and exercising its franchises therein, and became, therefore, in respect to its railroad in Rhode Island, a corporation in and of that State. The learned Justice, referring to an act of the Legislature of Rhode Island, passed subsequent to the purchase, regarding the status of the Boston, Hartford and Erie Railroad Company, said: "If it had no previous existence as a corporation, under the laws of Rhode Island, it would have become such by virtue of the act in question. For although, as a Connecticut corporation, it may have had no capacity to act or exist in Rhode Island for these purposes, and no capacity, by virtue of its Connecticut charter, to exercise any franchise not contemplated by it, yet the natural persons who were corporators might as well be a corporation in Rhode Island as in Connecticut, and by accepting charters from both States could well become a corporate body, by the same name and acting through the organization, officers and agencies in each, with such faculties in the two jurisdictions as they might severally confer; * * * so that in Rhode Island it was exclusively a corporation of that State." *Memphis, etc., Railroad v. Alabama,* 107 U. S., 581. The question again came before the Court in *Graham v. Boston, Hartford and Erie Railroad,* 118 U. S., 161. The Legislature of New York passed an act authorizing the Boston, Hartford and Erie Railroad Company to consolidate with other New York corporations, providing that when the consolidation was completed and a certificate thereof filed with the Secretary of

State, the Boston, Hartford and Erie Railroad Company should become possessed of the rights of charter, property, etc., of the selling company. *Mr. Justice Blatchford* said: "This act professes in its title to be an act to consolidate the three companies. It authorizes the sale to the Boston, Hartford and Erie Railroad Company of the franchises and property of the other two corporations (which were New York corporations) and provides that such sale shall pass the title to such franchises and property, and that the purchasing company shall thereby become possessed of the rights of charter and property sold, and thereafter have, hold and use the same in its own name and right. As a purchaser of what this act authorized to be sold to it, the company purchasing became a New York corporation by its then existing name."

In *Railroad v. Vance,* 96 U. S., 450, *Mr. Justice Harlan,* discussing the legal effect of language used in a statute, not so strong as in The Code (sec. 697), says: "The language was something more than a mere license to an Indiana corporation to exert its corporate powers and enjoy its corporate rights and privileges in another State. * * * We cannot thus restrict the effect of the act without disregarding wholly the ordinary meaning of the plain words of the second section, which declares that the lessees, their associates, successors, etc., shall be a railroad corporation in the State of Illinois. * * * The fact that it bears the same name as that given to the company incorporated by Indiana cannot change the fact that it is a distinct corporation, having a separate existence derived from the legislation of another State." The learned Justice clearly distinguishes the case from *Railroad v. Harris, supra,* by saying that the Illinois act declares in express terms that the Indiana corporation leasing the road "shall be a railroad corporation in that State, * * * with authority to exercise, not the powers which had been granted by the State of Indiana to another corpora-

tion of the same name, created under the laws of that State, but the same powers which were possessed by a corporation theretofore created under the laws of Illinois." The distinction, so clearly pointed out in that case, is again stated by *Mr. Justice Gray* in *Martin v. Baltimore and Ohio Railroad*, 151 U. S., 673, and the cases illustrating the two classes cited, concluding with the declaration that those falling within the first class—of creation—"cannot remove into the Circuit Court of the United States," whereas those in the second class—of licensing—can do so.

*Judge Thompson*, in 10 Cyc., 290, thus states the principle deduced from these and other cases cited in the note: "The Legislature of one State may make a corporation organized under the laws of another State, which has become the purchaser of the properties and franchises of a corporation of the domestic State, a domestic corporation *quoad* any property thus purchased which has its *situs* within the domestic jurisdiction." The question was decided by the Supreme Court of Georgia in *Angier v. East Tennessee, Virginia and Georgia Railroad*, 74 Ga., 634. The facts in that case are strikingly illustrative of the principle involved in this appeal. The Cincinnati and Georgia Railroad Company, a domestic corporation, had under its charter constructed a road from Macon to Brunswick. The Cincinnati and Georgia Railroad Company sold and transferred all of its "rights, titles, privileges, properties, franchises, etc.," to the East Tennessee, Virginia and Georgia Railroad Company, a Tennessee corporation, and it assumed all of the duties, etc., and the two became merged under the name of the purchasing corporation. A suit having been brought against the corporation, a petition for removal was filed and allowed. The plaintiff appealed. *Jackson, C. J.*, after commenting upon *Clark v. Barnard, supra,* says: "The power granted to the Cincinnati and Georgia Railroad Company to sell its charter, franchises,

rights and privileges is so broad as to embrace its life, its all, and when it did, under this power, sell its rights, franchises, powers and privileges of every description to the East Tennessee, Virginia and Georgia Railroad Company, and the latter assumed its debts, obligations and burdens of every sort, it does appear to have sold itself, and nothing was left of the corporate being Georgia had made, but its life passed into its buyer, and the purchaser became the Georgia corporation in its stead.  *  *  *   This is no license to the East Tennessee, Virginia and Georgia Railroad to use its franchises, or any of its powers already granted, in Georgia, but it is a right to buy the charter and all the franchises of a Georgia road. In other words, the charter of that Georgia company gives it power to buy this East Tennessee, Virginia and Georgia Railroad Company or sell itself to that company; to sell its entire charter, by which alone it has life, and when it does sell, it dies, but another entity immediately lives in its place, and, living in its stead, becoming itself under the charter granted to the being it bought, it is immediately, by the charter which it bought, a domestic Georgia corporation, having all the powers and subject to all the liabilities of that charter. *  *  *   It is not by implication or inference at all that the new corporation steps into the shoes of the old one.  It is by the direct, clear and unmistakable grant of the power to buy a charter or contract of the State.  *  *  *   The truth is to be ascertained whether the State intended merely to license a foreigner to exercise franchises and buy a charter she granted to another, without assuming all the liabilities which the charter it bought required, or did she intend it to be a domestic corporation and under all the obligation of corporation citizenship?"  The learned Chief Justice says that it is clear that the State intended to substitute the purchaser for the entity she allowed to be purchased, and to make the purchaser subject to her control in her own borders as fully as

the seller of the charter had been before its sale—that the purchaser absorbed the life of the seller, "drawing all its breath into its own lungs; it is a question of life, not of names." The petition for removal was denied. It is stated by the Reporter that a writ of error was applied for, and declined, it would seem, for the reason that there was no final determination of the cause.

The effect of the sale of a charter or franchise by a corporation is thus stated by *Welch, C. J.,* in *Ohio v. Sherman,* 22 Ohio St., 411 (p. 428): "That a corporation can, when authorized by law so to do, transfer, sell or convey its charter or franchise to be a corporation, and thus vest it in others, seems to be quite well settled by judicial decisions.   *   *   * The real transaction in all such cases of transfer, sale or conveyance in legal effect is nothing more or less, and nothing other, than a surrender or abandonment of the old charter by the corporators and a grant *de novo* of a similar charter to the so-called transferee or purchaser. To look upon it in any other light and to regard the transaction as literal transfer or sale of the charter is to be deceived, we think, by a mere figure or form of speech. The vital part of the transaction, and that without which it would be a nullity, is the *law* under which the transfer is made. The statute authorizing the transfer and declaring its effect is the grant of a new charter, couched in a few words and to take effect upon condition of the surrender or abandonment of the old charter, and the deed of transfer is to be regarded as mere evidence of the surrender or abandonment." *Railway v. People,* 123 Ill., 467. "The Legislature, in giving a corporation of another State power to purchase a railroad in this State, with the privileges and franchises belonging thereto, had the undoubted right to prescribe the terms upon which the purchase could be made." *State, etc., v. Chicago, B. & K. R. R.,* 89 Mo., 523. "Every power which a corporation exercises in another

State depends for its validity upon the laws of the sovereignty
in which it is exercised." *State v. Bailey,* 16 Ind., 46.

It will be noted that in all of the cases from which we
quote it was shown that the purchasing corporation had, by
its charter, the power to purchase, giving basis to the conten-
tion that the power conferred upon the selling company was
but a license to the purchasing company to exercise the func-
tions conferred by the charter in the State of the selling com-
pany. This contention is, in every instance where the lan-
guage of the statute denotes an intention to create and not to
license, denied. There are cases in which the language of the
statute is so construed. *Martin v. Railroad, supra.* It is
elementary that a corporation can have no existence beyond
the limits of the State or sovereignty which brings it into life
and endows it with its faculties and its powers. *Railroad Co.
v. Wheeler,* 1 Black, 286. It is equally so that "having no
absolute right of recognition in other States, but depending
for such recognition in other States and the enforcement of
its contracts upon their assent, it follows as a matter of course
that such assent may be granted upon such terms and condi-
tions as those States may think proper to impose.   *   *   *
A State may, for reasons of its own, adopt the foreign corpo-
ration by creating it a domestic corporation.   *   *   *
When a State pursues the latter course and adopts the foreign
corporation as one of its own creation, it follows, we think,
that all of its subsequent acts and transactions within the
State of its adoption are the acts of a domestic corporation,
that the franchises and powers there exercised were conferred
by local laws," etc. *Thayer, Circuit Judge,* in *Mo. Pac.
R. R. v. Meeh,* 69 Fed. Rep., 753; *State v. Chicago, B. &
Ky. Ry. Co.,* 89 Mo., 523; *Insurance Co. v. Prewitt,* 200
U. S., 246. "The Legislature, in granting to a foreign cor-
poration power to purchase a railroad and franchises within
the State, may prescribe the terms and conditions upon which

the purchase may be made and define the status within the State of the purchasing corporation." Noyes on Intercorp. Rel., sec. 164. Whether the Legislature has licensed a foreign corporation to exercise its powers within the State or has created a new corporation "is always a question of legislative intent and not of legislative power or legal possibility." *Railroad v. Harris, supra.* That the Legislature intended that any person or corporation purchasing the franchises and property of another corporation in this State should "forthwith become a corporation," succeeding to all of the rights, franchises, duties, etc., of the dissolved corporation, is manifest both from the *language* of the statute and history of its enactment read in the light of the decisions of this Court.

The question in respect to the power to subject corporate property, separate from the franchise, to sale for debt first attracted the attention of this Court in *State v. Rives,* 27 N. C., 297, wherein *Ruffin, C. J.,* in a carefully considered and elaborate opinion, discussed the question, holding that; while the property of a railroad company could be sold under execution, its franchise could not be disposed of without legislative sanction. He suggested that there should be legislation "providing for the keeping of the franchise with the estate." The question again came before the Court in *Gooch v. McGee,* 83 N. C., 59. It appeared that the plaintiff had purchased the lands of the Roanoke Navigation Company under execution. The question presented was whether he acquired any title. *Smith, C. J.,* reviewed the legislation enacted in consequence of what was said in *Rives' case,* and held that the purchaser acquired no title. He says: "This legislation, springing out of the decision in *Rives' case* and intended to obviate the inconveniences of a disruption of the company and a loss of those facilities for travel and transportation which it now afforded, must, we think, be deemed an expression of the legislative will to substitute the new in

place of the former remedy." By several amendments the statute law took the form found in The Code, 1883, secs. 697, 698. When the State, by an act of the Legislature, at a special session called for that purpose, sold its stock and interest in the Western North Carolina Railroad, a great work of internal improvement in the prosecution of which the State had expended an immense sum of money, it was expressly provided that the assignees of the State's interest should reorganize the corporation, with a capital of several million dollars. Acts special session 1880, ch. 26, secs. 8, 9; *Marshall v. Railroad,* 92 N. C., 322. There is not, in either the general or special legislation, the slightest indication that it was contemplated that this great thoroughfare, with its franchise, upon which so much time, labor and money had been expended, should become the property of a foreign corporation.

While it is true that we know, as a part of the State's history, that she has leased a portion of her railroads, this is very far from granting the franchise and the ultimate ownership of the property in foreign corporations not amenable to her courts or control. The right of her citizens to sue the lessor corporation in the State courts for redress of wrongs committed and enforcement of contracts made by the lessee is safeguarded and settled by repeated decisions of this Court. In *Logan v. Railroad,* 116 N. C., 940, *Mr. Justice Avery,* in a well-considered and able opinion, says that the power granted by the State to lease railroads "does not carry with it the authority to the lessor to absolve itself and transfer its duties and obligations to another, whether able or unable to respond in damages for its wrongs or defaults. The lessor company remains liable for the performance of public duties to private parties * * * for all acts done by the lessee in the operation of the road, notwithstanding the lease is authorized by the lessor's charter." *Pierce v. Railroad,* 124

N. C., 83. We are not inadvertent to the decision of this Court in *James v. Railroad*, 121 N. C., 523. Without entering into a discussion of the reasoning upon which the conclusion is reached, it is sufficient to say that we should feel constrained to follow the decision of the Supreme Court of the United States in *Julian v. Central Trust Co.*, 193 U. S., 93, wherein it is held that the effect of the sale, by the Special Master, of the property, franchise, etc., of the Western North Carolina Railroad Company operated to dissolve that corporation, thereby giving full force and effect to sections 697, 698 of The Code. We think the reasoning of the Court satisfactory. We do not perceive how the fact that the sale was under a second mortgage affected the status of the purchaser. The rights of the first mortgage were fully protected. What, then, became of the franchise of the dissolved corporation? It did not revert to the State or become separate from the property. It does not appear that the Southern Railway Company, "a corporation created by and existing pursuant to the laws of the State of Virginia," had any capacity, by its charter, to take, hold and exercise it. Certainly there is nothing in the statute law of this State indicating that a foreign corporation could, without express legislative authority, take, hold and use a charter granted by the State to a public-service corporation, with the right of eminent domain, to carry passengers and freight for fare and toll, thus holding and exercising one of the highest attributes of sovereignty. It is true that *Mr. Justice Day*, in *Julian's case, supra* (p. 107), says: "The Southern Railway Company was authorized by its charter, among other things, to purchase or otherwise acquire the property of any railroad company organized under the laws of another State." We presume that it so appeared in the record. It does not appear in this record, and we cannot take judicial notice of the contents of a private statute of a sister State. Again it is said:

"We have been cited to no statute of the State of North Carolina forbidding the purchase of a railroad at a foreclosure sale by a corporation of another State." It is of no importance to the State whether a foreign or domestic corporation, or whether individual citizens of this or some other State, purchase, because, by the act of purchasing, it or they, as the case may be, "shall forthwith be a new corporation (of this State), and the corporation *created by or in consequence of such sale and conveyance* shall succeed to all such franchises, rights and privileges, and perform all such duties as are owed by or imposed upon the first corporation."

It seems too clear to admit of controversy that, while there is nothing in our statute or State policy which forbids a foreign corporation from buying a railroad, *eo instanti* that it does buy and take the conveyance, *and because thereof,* it becomes by statutory creation a domestic corporation. If, as we have seen from a line of decisions of the Supreme Court of the United States, the *purchase* of a franchise by a foreign corporation, by authority of the Legislature, makes the purchasing corporation *quoad* the franchise and property purchased a domestic corporation, much more certainly does the result follow where the power to purchase is coupled with the declaration that it "shall forthwith become a new corporation." It is inconceivable that the State of North Carolina ever intended or contemplated that franchises granted by her to public-service corporations, for the benefit of the public, the furnishing of transportation for her own people and their products and property, should be purchased and owned by foreign corporations, over which her Legislature and courts have no control or power of visitation. We know from public records that every railroad company operating in this State issues bonds and is mortgaged to secure their payment. If the contention of the Virginia corporation be correct, every railroad, with its franchises and property, may,

by defaulting in the payment of interest, be sold under such mortgages and purchased by foreign corporations, with all of the legal incidents flowing therefrom. Her citizens may thereby be taken from the courts of the State at immense cost, expense and delay, and by reason thereof be practically denied redress for many wrongs committed by such foreign corporations. We have carefully examined the language of *Mr. Justice Day* in *Julian's case, supra.* It will be noted that the question presented and discussed in that case did not in any manner involve the point now under examination. This Court, in *James v. Western North Carolina Railroad, supra,* had held, for the reasons set out in the opinion, that the sale by the Special Master did not work a dissolution of the original corporation, and that therefore the purchaser was operating the road and using the franchise granted to that corporation, thereby being liable for its torts and debts. The purpose of the *Julian case* was to have that case reviewed and enjoin the sale of corporate property under executions issued against the Western North Carolina Railroad Company. The question of domicile was neither presented, argued nor considered. It seems from the language of the learned Justice that the suggestion was made "that the State requires a domestic corporation, organized under and subject to its laws, to become the purchaser of a railroad." He says that he does not find "such to be the case." We entirely concur with his conclusion. As we have said, the State does not require a domestic corporation organized to purchase, but does *create* the purchaser into a domestic corporation, which, by operation of law, takes, owns and uses the franchises of the dissolved or, in the language of the statute, "the first corporation." The learned Justice cites section 1936 of The Code for the purpose of finding the status of the purchasing corporation. It will be noted that section 1936 does not refer to corporations which, by virtue of a sale of their property

COAL AND ICE CO. *v.* RAILWAY CO.

and franchises, have been dissolved and their franchises vested in the purchaser, but to those cases where the "real estate, track and fixtures" have been sold, power is given to the purchaser to form a corporation in the manner prescribed. This act, it will be observed, was enacted at the session of 1871-'72, ch. 138, whereas sections 697, 698 were enacted at the session of 1872-'73, ch. 131. The facts set out in the complaint bring the case clearly within the last act. Of course, both statutes were re-enacted in The Code of 1883 and are to be construed together and reconciled.

The deed executed by the Special Master evidently had reference to sections 697, 698, because, following the mortgage, it expressly transferred the rights, privileges and franchises of the Western North Carolina Railroad Company. There is no suggestion that the purchaser at the sale has organized as a corporation, pursuant to the provisions of section 1936; hence, if this section is controlling, the Virginia corporation, without any authority and without having complied with the laws of this State, has for more than twelve years operated a railroad, extending its lines, condemning property and otherwise exercising attributes of sovereignty in this State without authority and without limit. If it is not limited by the charter of the Western North Carolina Railroad Company, it has no limit. It does not, in its petition, profess to hold the property by virtue of having complied with section 1936. Unless, by virtue of the provisions of sections 697, 698, it owns and exercises the franchise of the Western North Carolina Railroad Company, it occupies a most anomalous position in this State. If it may do so and avoid the clear, unmistakable legal operation of the only statute by which as purchaser it could acquire the franchise, we can see no reason why, by the same mode of procedure, every railroad in the State, other than those in which the State owns a controlling interest, may not, by sale under mortgage

upon them, pass into the control of foreign corporations, with all of the incidents attaching thereto. We are not prepared to reach such a conclusion, nor do we think our statutes capable of such construction. Foreign corporations may purchase, and their rights of property thus acquired will be protected, but by the act of purchasing and taking title the breath of the expiring domestic corporation passes into and imparts life to a "new corporation," and by such life-giving process the purchaser becomes like "the first corporation"—domestic. The statutes thus construed secure harmony, protect property rights; the State retains control of her corporate creature and the citizen is permitted to litigate his rights in the courts of the State.

It is insisted, however, that recent decisions of the Supreme Court hold that a foreign corporation may become domestic for some purposes, but retain its citizenship in its domicile of original creation for the purpose of jurisdiction. That, notwithstanding the fact that the Southern Railway Company is created for the purpose of owning the Western North Carolina Railroad Company, a domestic corporation, the Virginia corporation may remove a cause brought against it into the Federal Court. It would seem that the language used by *Judge Gray* in *Martin v. Railroad, supra,* is conclusive that where a corporation of one State is *created* a corporation of another State, it cannot remove its causes, whereas where such corporation is *licensed* to do business in another State it may do so, and this we understand to be the distinction upon which the *Allison case,* 190 U. S., 326, is decided. In that case the Court construed the act of 1899, known as the "Craig Act," to license and not create. By the provisions of that act the foreign corporation was required to file a copy of its charter in the office of the Secretary of State, whereupon it should "become a corporation of this State." This act the Court held to license the foreign corporation to come into

this State. Certainly no such attitude can be assumed by the Virginia corporation in this case. It is either a foreign corporation, owning and exercising in this State corporate franchises conferred by the State of Virginia, or it has no legal status here. No language can be found in the statute capable of any such construction as was given to the "Craig Act." The language quoted by *Justice Shiras* from the opinion in *Railroad v. Alabama,* 107 U. S., 581, seems peculiarly applicable here. Speaking of the Alabama statute, he says: "The whole act taken together manifests the understanding and intention of the Legislature of Alabama that the corporation which was thereby granted a right-of-way to construct through this State a railroad   *   *   *   was and should be in law a corporation of the State of Alabama, although having one and the same organization with the corporation of the same name previously established by the Legislature of Tennessee." The Court held in that case that, for the purpose of jurisdiction, the corporation thus created was a citizen of Alabama. By comparing the powers conferred upon the corporation in that case with those conferred upon the Western North Carolina Railroad Company, to which the purchaser succeeded, it will be seen that the latter are equally extensive and can be exercised only in the State. The power is given the Western North Carolina Railroad Company to condemn land, to construct branches, to do any and all things necessary to extend, construct and operate a railroad. The very acts of which this plaintiff complains are an assertion of the right and power to enter upon and take private property for tracks. "That the wrongs and injuries aforesaid were done and are threatened by said defendant in its capacity as successor of said Western North Carolina Railroad Company and pretending to act under color of the deed set out in the ninth paragraph of the complaint." For the purpose of this appeal this is admitted to be true. We are unable to see why the language used in

the Alabama case is not applicable here. The defendant, being a corporation of the State of Virginia, has no existence in this State, as a legal entity or person, except under and by force of its incorporation by this State. The Court, in *Allison's case, supra,* recognizes the distinction. Two other cases are relied upon to sustain the proposition that, for the purpose of jurisdiction, the domicile of original creation controls the jurisdiction.

The fact must be kept in view that this is not a case of consolidation or of licensing. It is true that the Virginia corporation was received as a purchaser of the property, but immediately, by operation of law, upon becoming a purchaser a "new corporation" came into existence, drawing its life from the expiring corporation to whose franchise it succeeded. The Virginia corporation took no property or franchise, but the "new corporation" took both. It is not practicable to set out the facts in *Railroad v. James,* 161 U. S., 545. The language of *Judge Gray* in the *Alabama case* is quoted with approval. The following language of *Judge Miller* in *Penn. R. R. v. St. L., etc., R. R.,* 118 U. S., 290, is also quoted: "It may not be easy in all such cases to distinguish between the purpose to create a new corporation, which shall owe its existence to the law or statute under consideration, and the intent to enable the corporation already in existence, under laws of another State, to exercise its functions in the State where it is so received.   *   *   *   To make such a company a corporation of another State the language must imply creation or adoption in such form as to confer the power usually exercised over corporations by the State, or by the Legislature, and such allegiance as a State corporation owes to its creator. The mere grant of privileges or powers to it, as an existing corporation, without more, does not do this, and does not make it a citizen of the State conferring such powers." In the *James case* the St. Louis, etc., Railroad Company, a

Missouri company, purchased from corporations of Arkansas certain railroads already built by them. The Arkansas corporations maintained their separate organizations, but did not operate railroads. The Court said: "It is therefore obvious that such purchase by the Missouri corporation of the railroad and franchises of the Arkansas companies did not convert it into an Arkansas corporation. The terms of the statute show that it merely granted rights and powers to an existing foreign corporation, which was to continue to exist as such, subject to certain conditions." The distinction between that case and the one before us is obvious. Here the corporation whose property, franchise, etc., were sold ceased to exist or maintain any organization—it was dissolved. *Julian's case, supra.* There was legislation in Arkansas subsequent to the purchase by the foreign corporation which the Court held did not create an Arkansas corporation out of a foreign corporation. Again the learned Justice says: "It shall be observed that, in the present case, the corporation was not incorporated as such by the State of Arkansas. The Legislature of that State was professedly dealing with the railroad corporations of other States." It was further noted that the Constitution of Arkansas provided "that foreign corporations may be authorized to do business in this State," etc. But they were not to have the right of eminent domain. A careful examination of the facts in the case, and the opinion, show clearly that the decision is put upon the language of the Arkansas statute, which is radically different from ours.

If we are correct in the conclusion that the defendant is a North Carolina corporation, it is clear that, if composed of three or more persons who were citizens of Virginia, the corporate entity thus created would be domestic for all purposes. We are unable to see how or why the fact that the corporate entity having its domicile in Virginia, created a corporation in this State, occupies any different status; if so, all that is

said about the power of the State to incorporate a foreign corporation in such State goes for nothing, and the language used in *Martin v. Railroad, supra,* is overruled, although we find no suggestion that it is so intended.

It is conceded by the learned Justices of the Supreme Court of the United States that the decisions of that Court in regard to the presumption of citizenship of stockholders in corporations are not uniform. We do not presume to undertake to reconcile the contradictory decisions, if there be any. The last case in which the question is discussed is *Railway v. Louisville Trust Co.,* 174 U. S., 552. It seems from the statement of the case that the plaintiff, called in the record New Albany Company, was originally incorporated by the Legislature of Indiana. Power was conferred upon it to exercise all of the franchises, powers, privileges, etc., conferred upon it by the laws of that State, "or any other State in which any portion of its railroad may be situate," etc. The Legislature of Kentucky passed an act to incorporate the New Albany and Chicago Railroad Company, conferring power upon it to purchase, lease, etc., certain property, with the right of eminent domain. Thereafter the New Albany Company, describing itself as an Indiana corporation, consolidated with certain railroads in Illinois. The New Albany Company was not shown to have formally accepted the statutes passed by the Kentucky Legislature or to have organized as a corporation under them, but the Court holds that it did acts which amounted to acceptance. The New Albany Company filed a bill in equity in the Circuit Court of the United States for the District of Kentucky, describing itself a "corporation duly organized and existing under the laws of the State of Indiana," against certain Kentucky corporations. Pleas to the jurisdiction were filed, asserting that plaintiff was a corporation and citizen of Kentucky. They were overruled. *Mr. Justice Gray,* repeating the language so often

used regarding the power of one State to create a corporation of another State a corporation of the first State, and noting the distinction between such an act and one merely granting privileges, etc., to an existing corporation, and citing the authorities which we have so often cited, says: "But a decision of the question whether the plaintiff was or was not a corporation of Kentucky does not appear to this Court to be required for the disposition of this case, either as to the jurisdiction or as to the merits." We must say, with all possible deference, that the language which follows this statement is not very clear to us. He says: "As to the jurisdiction, it being clear that the plaintiff was first created a corporation of the State of Indiana, even if it was afterwards created a corporation of the State of Kentucky also, it was and remained, for the purpose of the jurisdiction of the Courts of the United States, a citizen of Indiana, the State by which it was originally created." The fact that it was created a corporation by the State of Kentucky of course did not affect the corporate entity existing in Indiana or prevent its suing in the courts of Kentucky as an Indiana corporation. This is exactly what it did, so describing itself. The Judge goes on to say: "It could neither have brought suit as a corporation of both States against a corporation of either State, nor could it have been sued as a corporation of Kentucky in any Court of the United States." It would seem that, in view of the fact that the suit was brought by the Indiana corporation, as such, against Kentucky corporations, there could be no question as to the jurisdiction, and, as said by the Court, the question whether there was also a Kentucky corporation of the same name was immaterial. The last part of the quotation seems to be *obiter* and not in harmony with numerous decisions to the contrary. This is the view of Mr. Moon in his work on Removal of Causes, sec. 129. While the later expressions of the Court appear to indicate a purpose to recog-

nize the distinction between the domicile of creation, for the purpose of control and of jurisdiction, we do not find any decision overruling the line of cases holding that where the language of the statute manifests a clear intention to create a new corporation, and not to license or permit an existing foreign corporation to exercise its powers in the State, and such act of creation is accepted, a domestic corporation is created. The later decisions are discussed by *Putnam, Circuit Judge,* in *Smith v. N. Y., N. H., etc., R. R.,* 96 Fed. Rep., 504.

There is not in this record any indication that the Virginia corporation had the power or capacity to buy and operate the Western North Carolina Railroad Company and its franchises, nor is there anywhere to be found such indication that the State ever empowered or intended to empower a foreign corporation to buy and own, free from the jurisdiction of her courts, the franchise granted by her to a domestic corporation for the benefit, primarily, of her own citizens. If she has by some fiction of the courts done so, and made it possible for every mile of her great railroad systems, with the liberal charters granted to them, conferring power near akin to that of taxation, which has been said to be the power to destroy, it may be well, in the language of *Chief Justice Ruffin,* "If it so please the Legislature" to find some lawful means, under her constitutional reservation of power, to restore to the State the control of these creatures of her own creation. Const., Art. VIII, sec. 1. They were created by her sovereign will, their property constructed by money taken from her revenues, built upon land acquired by the right of eminent domain and protected by her Constitution and laws. It would seem that they should be held responsible in her own courts for the manner in which they use and exercise these attributes of sovereignty. We are of opinion that, by the weight of authority, and certainly the reason of the thing, such is the law.

The order for removal must be reversed and the cause proceed to hearing in the Superior Court of Buncombe County. It is so ordered.

Reversed.