E. D. LATTA v. CATAWBA ELECTRIC COMPANY et al.*

(Filed 11 December, 1907).

1. **Deeds and Conveyances—Uses and Trusts—Trusts and Trustees—Title—Equity.**

    The purchaser of a tract of land, the title to which was taken by another, under his direction, thereby acquires no title to or estate in the land, but an equity to call upon such person to execute the resulting trust by conveying to him the legal title to the property.

2. **Deeds and Conveyances—Easements—Water and Water Courses—Adjoining Lands—Trusts and Trustees.**

    A conveyance of land, including certain water rights, does not, in itself, convey an easement in adjoining lands subsequently acquired and paid for by the grantor, the title to which was held, under his direction, by another for him, although the deed conveyed the right to erect dams, such as may be "necessary to control, use and enjoy to the full extent the full, entire, available water power of the whole river between the points and within the boundaries" set out therein.

WALKER, J., did not sit.

LATTA *v.* ELECTRIC CO.

3. Deeds and Conveyances — Lands — Appurtenant — Easements — Rights Acquired.

Only incorporeal hereditaments, and not land, pass under the description of rights appurtenant to land. .

4. Deeds and Conveyances—Water and Water Courses—Easements, Extent—Adjacent Lands.

An easement for ponding water back upon adjacent land, as appurtenant to the land conveyed, cannot be acquired to a greater extent than that used at the time of the conveyance, unless so expressed. The fact that the grantor had theretofore acquired such adjacent lands and had the title conveyed to a third person, because at some future time he might wish to raise the dam on the *locus in quo* and back water upon it, does not affect the rights of the parties.

5. Same—Adverse Possession.

A conveyance of land, and the right to pond water within the boundaries therein set out, does not of itself convey such right upon an adjoining separate and distinct tract of land of the grantor, and such right cannot be acquired except by twenty years' adverse user.

6. Deeds and Conveyances—Corporations—Insolvency—Bond Issue, Invalid—Creditors—Burden of Proof.

When the defendants, who are creditors of a corporation, allege that a deed made by it to the plaintiff's grantor was invalid, for that at the time it was executed the company was insolvent, and that it was for a pre-existing debt due the grantee, a director, and endorsed by the president, the burden of proof is upon the defendants to show that the company was insolvent at the time the conveyance was executed, and that they, as creditors, are in a position to attack it.

7. Same—Evidence—Admissions.

When the defendants seek to avoid the plaintiff's deed upon the ground that the corporation was insolvent at the time of its execution, a judgment in a separate and distinct action, to which plaintiff was not a party, adjudging the company insolvent, is no evidence thereof in this action. The admissions of the president of the corporation made therein, and in his own interest, are not admissible.

8. Same—Estoppel.

The plaintiff is not estopped to deny the insolvency of a corporation which executed to him a deed for the *locus in quo.*

9. Corporations—Insolvency—Evidence—Declarations—Estoppel.

When the question of insolvency of a corporation is material to the inquiry and is dependent upon the validity of certain bonds

issued by the corporation, evidence that the plaintiff, as agent of another, filed with the Clerk of the Court in a former action proof of claim for some of these bonds is competent as a declaration of plaintiff and his grantor prior to the conveyance to him, but such acts have no element of an estoppel when there is no contention that anyone was induced to buy the bonds on that account.

10. Deeds and Conveyances—Corporations—Insolvency—Creditors—Burden of Proof.

When the creditors of a corporation attack a deed given by the corporation to the plaintiff, upon the ground of insolvency of the corporation at the time of its execution, and the question of insolvency is dependent upon whether a certain bond issue was a valid indebtedness against the corporation, the burden of proof is upon the creditors to establish the validity of the bond issue; and where there is conflicting evidence the question is one for the jury.

11. Same—Evidence—Issues.

When a deed from a corporation is attacked upon the ground of insolvency of the corporation at the time of its execution, and this question is dependent upon the further question whether certain bonds are valid, the question of validity is presented upon the issue of solvency.

12. Same—Innocent Purchasers for Value.

When the plaintiff's deed is attacked for that it is alleged to have been made by an insolvent corporation to one of its directors in payment of an antecedent debt, endorsed by its president, and there is evidence on the part of the plaintiff tending to show he did not know of the financial condition of the corporation at the time of the conveyance to his grantor, the director therein; that he did not then know his grantor was a director, and that he paid an adequate price for the land conveyed, the question of his being a purchaser for value without notice is properly submitted to the jury.

13. Evidence—Depositions—Legal Holidays.

A legal holiday has not the same status in respect to legal proceedings as Sunday; and, while, under Revisal, sec. 2838, depositions opened on the latter day are void, they are not so when they are opened on a legal holiday.

14. Parties—Corporations—Insolvency—Pleadings.

When a corporation is a party defendant in an action upon the theory that it is a going concern, it is not error in the court below to permit it to file an answer, under the objection of the

other defendants, upon the ground that the corporation had fraudulently disposed of its property, and that they were large stockholders, when their interests are not thereby prejudiced, especially when it appears that it is in the interest of creditors that the affirmative relief set up in the answer by way of counterclaim be maintained.

15. **Corporation, Sale of Its Property — Dissolution — Parties — Answer—Counterclaim.**

When, under sections 697 and 698 of The Code of 1883, the defendant corporation was dissolved by sale of its property, franchises, etc., and a counterclaim was set up in the answer, in which creditors' rights were involved, relating to a time antedating the sale, it was not error in the court below to permit, under the objection of the other defendants, the defendant corporation to file an answer, as they are not otherwise in a position to litigate the counterclaim.

16. **Corporation, Sale of Its Property—Officers—Fraud—Receiver.**

If, during the continuance of a corporation, since dissolved by the sale of its property, franchises, etc. (The Code, secs. 697, 698), its officers had fraudulently or unlawfully disposed of its property, the creditors are entitled to have a receiver appointed to sue for and recover such property.

CIVIL ACTION, tried before *Ward, J.,* and a jury, at May Term, 1907, of the Superior Court of GASTON County.

This action was brought by plaintiff against defendants, Catawba Electric and Power Company, Fidelity and Deposit Company, Alcæus Hooper and another, trustees of the estate of W. E. Hooper, the Woman's College of Baltimore, and others, pursuant to Revisal, sec. 1589, for the purpose of quieting title to the lands described in the complaint.

The plaintiff claimed three tracts of land, and showed title thereto: 1st. The Bissell tract, by deed from Emily Bissell to W. T. Jordan, bearing date 13 July, 1893. This deed, after describing the land by metes and bounds, conveys all water rights and privileges on said premises, with the right to erect dams in the Catawba River for the purpose of utilizing the fall of said river embraced in the boundaries, free from any claim for damages to any land of the grantors, provided the dam or dams may be placed in said river at what is designated

in the plat as the "lower bench mark," or at any other place, and that the dam shall not, wheresoever placed, raise the water at said mark more than four and a half feet above the iron peg in the rock, being the "lower bench mark," and located at the upper end or just above the upper end of the Rumfelt Island. This land, except a small portion, is covered by water. 2d. The Sample tract, by deed from Hugh Sample to W. T. Jordan, dated 6 March, 1899. 3d. The Lineberger tract, by deed from R. E. Lineberger to W. T. Jordan, dated 28 March, 1899. These deeds convey certain water rights not necessary to be set out here. The jury find (record, pp. 59, 60) that the said Jordan purchased these tracts of land, with the water rights attaching thereto, for W. J. Hooper, and paid for same with money furnished by said Hooper, who was carrying on business in the name of the W. J. Hooper Manufacturing Company. It was admitted that the title to said lands was in the grantors at the dates of the deeds. 4th. On 29 May, 1900, said Jordan, by direction of said W. J. Hooper, and for a nominal consideration, conveyed the three above-named tracts of land, with all of the water rights which he acquired by said deeds, to the Catawba Electric and Power Company. 5th. On 4 February, 1901, said power company conveyed the said three tracts of land, with the water rights, to William Barbour. The consideration of this deed was that said Barbour should credit the original cost of said lands, amounting to about $7,000, on a note held by him against the said power company, endorsed by said W. J. Hooper and the William J. Hooper Manufacturing Company. This was done by and with the consent of said W. J. Hooper, who, together with said Barbour, was, at the date of said deeds, a director of said power company. 6th. On 11 September, 1901, Barbour, for a recited consideration of $5, but an actual consideration of $7,220, being the amount paid by Barbour, and interest, conveyed said three tracts of land, with the water rights, to plaintiff, E. D. Latta.

146—19

Defendant power company and its assignee showed title to a tract of land known as "The Mountain Island," on the Catawba River, containing 1,150 acres: 1st. By deed from Davidson to Pegram,. 28 May, 1883. 2d. Pegram to Tate, 8 April, 1884. 3d. Tate to W. J. Hooper, 9 April, 1884. This deed conveys by metes and bounds the Mountain Island property on the Catawba River, including certain water rights described in the deeds from Davidson to Pegram and from Pegram to Tate. It appears from the map filed herein that neither of these deeds describes or covers any part of the three tracts claimed by plaintiff. The map shows, and it was otherwise in evidence, that the Bissell tract is immediately above the Mountain Island land. The deed from Bissell to Jordan calls for the beginning point at "a hickory on the old corner on the Catawba River, between the Hooper and Bissell lands." The deed from Tate to Hooper calls for the beginning "at a hickory near the river bank." An examination of the plat shows that the hickory marked the corner of both tracts. 4th. On 20 November, 1894, W. J. Hooper conveyed to the said power company, in consideration of $25,000, the Mountain Island property, including all of the lands and water rights conveyed to him by Tate, to whose deed reference is made. 5th. On 1 May, 1895, said power company conveyed by deed in trust to the Fidelity .and Deposit Company the same lands, with the water rights, including all other property thereon. The purpose of this deed was to secure the payment of (1st) sixty-five coupon bonds, of $1,000 each, to be issued by said power company and known as "Class A"; (2d) eighty-six coupon bonds, of $1,000 each and known as "Class B," to be issued by said company. 6th. On 24 June, 1901, said deposit company and the alleged owners of the said bonds, the defendants herein, instituted an action in the Superior Court of Mecklenburg County against said power company for the purpose of foreclosing said deed in trust and subjecting the property conveyed therein to sale ·to pay said bonds and the accrued

interest thereon. The proceeding was duly prosecuted to judgment. The power company, by answer, admitted the allegations in the complaint, including the insolvency of said company. The property was brought to sale on 11 September, 1901, when the defendants herein, other than the said power company and the said deposit company, purchased said property for the sum of $175,000. The sale was duly reported, confirmed and, on 21 September, 1904, the said deposit company, pursuant to the order of the court, executed a deed to said purchasers conveying said property, with all water rights and other property, franchises, etc., which passed under the deed in trust. 7th. On 29 June, 1905, the said purchasers, grantees in said deed, conveyed said property to the Catawba Manufacturing and Electric Power Company, which was made defendant herein.

The defendants contend, first, that Jordan, acting for and under the direction of W. J. Hooper, purchased the Bissell tract for the purpose of securing the right to raise the dam across the river to develop the Mountain Island power to its full capacity; that the said Jordan held title to said land in trust for Hooper, the latter having furnished the money to pay therefor, and that, by reason of these facts and the peculiar relation of the Bissell tract to the Mountain Island land, Jordan (for Hooper) held same as appurtenant thereto, creating an easement or privilege in the owners of the Mountain Island property to pond water back upon it. They contend that the Sample and Lineberger tracts were purchased and held in the same way and subject to the same easement; that, by virtue of the deed from Hooper to the power company, 20 November, 1894, his equitable title attaching to the water rights in the Bissell land passed to said power company, and that they passed to the Fidelity and Deposit Company by the deed of 1 May, 1895, and by the successive conveyances vested in the defendant Manufacturing and Electric Power Company. As to the Sample and Lineberger tracts, two miles up the river

from the Mountain Island property, they make the same contention. Defendants tendered issues for the purpose of presenting their contentions in this respect, which his Honor declined to submit. Defendants excepted. His Honor held, as a matter of law, that the Lineberger, Sample and Bissell lands did not pass with the Mountain Island land under the sale of 11 September, 1901; that only such easement passed as existed, by ponding water on the Bissell land, at the date of the deed from Hooper to the power company. Defendants excepted. They further contend that, at the date of the deed from Bissell to Jordan, 13 July, 1893, and of the deed from Hooper to the power company, 20 November, 1894, the dam over the Catawba River backed water upon the Bissell land. The jury find that on neither of these dates, nor before, did the dam, as it then existed, back water on the Bissell tract. (Record, pp. 59, 60; issues 4, 5). The defendants further contend that the "lower bench mark" referred to in the deed from Bissell to Jordan was below the Bissell land and on the Tate land. The jury find otherwise. (Record, p. 60; issue 10). The defendants, other than the deposit company and the manufacturing and electric company, contend that, if the three tracts claimed by plaintiff, or easements thereon, did not pass as appurtenant to the Mountain Island land, then and in that event the deed from the power company to Barbour, 4 February, 1901, was fraudulent and void, for that the said power company was at that time insolvent; that both Barbour and Hooper were directors in said company, and that plaintiff, on 11 September, 1901, the date of his deed from Barbour, had notice of these facts; that the consideration of the deed to Barbour was a pre-existing debt due Barbour, and that this was known to plaintiff.

Plaintiff denies each and every of these allegations, except that Barbour was a director in said company. He further alleges that he was a purchaser from Barbour for value and without notice of any of the alleged vitiating facts. Appro-

priate issues were submitted to the jury to present these several contentions, and found for the plaintiff.

Defendants presented a number of prayers for special instructions, and duly noted exceptions to his Honor's refusal to give them. These exceptions are discussed in the opinion. There was judgment for plaintiff. Defendants excepted and appealed.

*W. B. Rodman, O. F. Mason* and *C. W. Tillett* for plaintiff.
*Armistead Burwell, F. I. Osborne, R. G. Lucas* and *Maxwell & Keerans* for defendants.

CONNOR, J., after stating the case: The plaintiff, having shown a complete chain of title to the Bissell, the Lineberger and Sample properties, was, in view of the admissions in the answer that defendants were claiming to own said properties, or an easement in them, entitled to judgment quieting his title, unless the defendants made good either of their contentions referred to in the answer as counterclaims. The cause was well and carefully tried in the court below, and argued in this Court with more than usual learning and ability. The record contains forty assignments of error. The real merits of the controversy, however, following the orderly arrangement of the briefs, are reduced to but a few propositions. It will be convenient to discuss them in the order in which they were argued. Defendants' first contention is thus stated in the brief: "That the Fidelity and Deposit Company and its assigns have an easement, privilege or right to erect on the Mountain Island shoal a dam sufficient in height and extent to enable it or its assigns to use the full power of the Catawba River at that place." This right, privilege or easement alleged to have vested in the power company, it is claimed, passed to the deposit company by the deed in trust of 1 May, 1895. His Honor held, as a matter of law, against defendants' contention. The exception to this ruling, therefore, presents the question whether, upon the entire evidence, con-

sidered most favorably for defendants, any such burden or easement is imposed upon the properties for the benefit of the Manufacturing and Electric Power Company, the present owner of the Mountain Island or Tate land. It will be well to discuss the questions as they affect the Bissell property, first, because in some aspects it differs from the Lineberger and Sample properties. The defendants' claim is based upon the following facts: Prior to 28 May, 1883, James M. Davidson owned certain water rights in the Catawba River, which he conveyed to Miles Pegram, who, on 8 April, 1884, conveyed the same water rights, etc., to James T. Tate and others, who were at the time operating the Mountain Island Mills. These water rights are described in the deed and located by the testimony of the surveyor, Fichte. They do not cover any portion of the Bissell property.

Prior to 8 April, 1884, James T. Tate and others were the owners of a tract of land lying on and going to the center of the Catawba River, containing 1,150 acres. The Mountain Island Mills, including a valuable water power, were located on this land. On 9 April, 1884, Tate and others conveyed this land by metes and bounds to W. J. Hooper, of the city of Baltimore. The water rights acquired by Tate from Pegram are conveyed by this deed. The first call in the deed is "a hickory near the river bank." The *habendum* of the deed is in the following language: "To have and to hold the same and all mills, machinery and fixtures thereon or appertaining thereto; also the right, power and privilege to build upon or annex to the east bank of the river, at any point or points, place or places, any dam or dams, as far thereupon or into said bank as may be necessary to control, use and enjoy to the full extent the full, entire available water power of the whole river, between the points and within the boundaries hereinbefore and as set out in the deed from Davidson to Pegram." The Catawba Electric and Power Company was incorporated 6 March, 1893 (Private Laws of 1893, ch. 307).

On 20 November, 1894, W. J. Hooper, by deed referring to and adopting the description in the Tate deed, conveyed the same property, known as the "Mountain Island Mills," to said Catawba Electric and Power Company. It is conceded that all of the right, title, privileges or easements to or in said property which passed to the power company have, by the deeds set out in the statement of facts herein, passed to and vested in the Catawba Manufacturing and Electric Power Company by deed, dated 29 June, 1905. It is further conceded that neither of these deeds conveys, nor do they include in the description therein, the Bissell property.

Prior to 13 July, 1893, Mrs. Emily Bissell and others were the owners of a tract of land, a very large portion of which was covered by water, lying on and constituting a portion of the bed of the Catawba River. This land adjoins the Mountain Island property, the beginning point being the hickory called for as the beginning of said land. On 13 July, 1893, W. T. Jordan was manager, etc., and W. J. Hooper was president of the Catawba Electric and Power Company. Jordan says: "I bought the Bissell property and took title in my own name. I took it in that way under instructions from W. J. Hooper, the president of our company. I purchased it because it was necessary to the Mountain Island property. The Bissell property and the Mountain Island property adjoin." He further testified that the W. J. Hooper Manufacturing Company paid for it. The deed from Bissell to Jordan of 13 July, 1893, describes the property by metes and bounds, beginning at the "hickory, the old corner on the Catawba River bank, between the Hooper and Bissell lands or properties." Following the description are the words, "it being the same land which was surveyed for the parties by John C. Fichte in July, 1893, plats or diagrams of which survey are hereto annexed and marked, respectively, 'A' and 'B,' and made a part of this deed." Certain covenants in regard to

water rights are set forth in the deed, to which further reference will be made.

On 29 May, 1900, Jordan, as found by the jury (issue 14), conveyed the Bissell property to the power company, by direction of Hooper. The consideration recited is one dollar. This deed refers to the deed from Bissell, and concludes as follows: "It is the purpose of W. T. Jordan, by this deed, to invest the Catawba Electric and Power Company with the title to all the lands, water rights and other easements acquired by the said Jordan by said deed," etc. It will be observed that this deed bears date six years subsequent to Hooper's deed to the power company, 20 November, 1894, and five years subsequent to the deed in trust from the power company to the Fidelity and Deposit Company, 1 May, 1895. The legal title to the Bissell property was, therefore, in Jordan at the date of Hooper's deed to the power company and of the deed from the power company to the deposit company. The defendants contend that, Hooper having paid the purchase money for the property, Jordan, having bought by his his direction, held the property in trust for him; that Hooper's purpose in buying through Jordan was to hold the Bissell property and the water rights attached thereto as appurtenant to the Mountain Island property, and that thereby the Bissell property, or at least an easement therein, became appurtenant to the said property to the extent set forth in the answer. The jury find that Hooper paid for the Bissell property and that Jordan took title thereto by his direction. Hooper had no title to or estate in the Bissell property, but a right to call upon him to execute the resulting trust by conveying the property. This, as said by *Pearson, J.,* in *Thompson v. Thompson,* 46 N. C., 430, "is a mere right and not an estate"; therefore, his deed to the power company could not carry as appurtenant any easement in the Bissell property which he did not own. The jury found that the dam of the Mountain Island Mill did not, at the date of the deed from Hooper to the

power company, back water upon the Bissell land. This finding eliminates the suggestion that any such easement was in existence at that time. The facts that Hooper describes the Tate or Mountain Island land by an express reference to the Tate deed to himself, and that this deed confines the water rights "between the points and within the boundaries hereinbefore," and "as they are set forth in the deed from Davidson," etc., leave no room for construction in respect to the property and water rights expressly conveyed by the deed. Of course, the land covered by water did not pass either by way of description or as appurtenant, for the manifest reasons that it is not within the description, and that land can never pass as appurtenant to land. "Only incorporeal rights pass as appurtenant to land, or under the description of 'appurtenances.' Land cannot pass as appurtenant." Jones Easements, sec. 20. "A thing corporeal cannot properly be appurtenant to a thing corporeal, nor a thing incorporeal to a thing incorporeal." Coke Litt., 121b. While it is unquestionably true that an incorporeal right may pass as appurtenant without being specifically named, it is equally true that the incorporeal right must be in existence before it can pass as appurtenant. The difficulty which confronts the defendants is in the failure to show that any easement in the Bissell land had been created, used or enjoyed by the owner of the Mountain Island land at the time of, or before, the conveyance to the power company. Certainly the mere fact that Hooper, the owner of the Mountain Island property, caused Jordan to purchase the Bissell property, because at some time in the future he might wish to raise the dam on his own property and back water upon it, does not, *ipso facto,* create an easement in the Bissell property for that purpose. For some reason, Hooper had the title taken to Jordan and held by him. This conduct on his part indicates a purpose to keep the two properties separate. Again, when he conveys the Mountain Island property, he carefully excludes the suggestion that he

intends to convey any rights which he might have in the Bissell property by confining the water rights, privileges, etc., to those which he acquired from Tate. As Hooper had not subjected the Bissell land to any burden or backed water upon it while he owned the Mountain Island land, and carefully excluded it from his deed, it would be doing violence to both the language used and his manifest intention to so construe the deed as to pass as appurtenant to the land an easement which had no existence. It is settled by decisions of this Court that, if one sells land on which a mill is located, an easement will pass with it as appurtenant to pond water above the mill to the same extent as was done at the time of the conveyance. In *Kestler v. Verble,* 52 N. C., 185, *Manly, J.,* said: "It seems entirely clear to us, upon the sale of the parcel of land, including the lower mill, to the defendant Verble, that an easement in the lands passed by implication to defendant, to the extent, at any rate, held by the Judge below. The defendant purchased as appurtenant to his mill the right to keep the water power *in the condition it then was* for the purpose of propelling his machinery." So, in *Bowling v. Burton,* 101 N. C., 176, *Merrimon, J.,* says that the deed conveying a mill carried the right to erect dams across the river, at the mill mentioned, to the extent claimed and exercised by the vendor at the time he executed the deed. A large number of cases cited in plaintiff's brief recognize the principle, with its limitation. In *Lamolt v. Ewers,* 55 Am. Rep., 746, it is said: "The doctrine is too familiar to justify elaboration that, when the owner of an estate during such ownership has, by artificial arrangements, made one part subservient to the other, thus enhancing the value of one by burdening the other, the conveyance of that, the value of which is thus enhanced, will carry the right to an easement in the other to the extent necessary to the enjoyment of that granted in the same condition in which it was enjoyed before. * * * As applicable to water rights, in a case where such rights are granted without

being otherwise specifically defined, since they are, in a measure at least, incorporeal and invisible, they are measured and limited as against the grantor by the extent to which they were designed to be used and had actually been made available for and applied to use." To the same effect is *Taylor v. Hampton,* 17 Am. Dec., 710. In *Hathorn v. Stinson,* 25 Am. Dec., 228, it was held that the grantee of a mill "acquired a right to continue the dam so as to raise the same head of water as the grantor had been accustomed to raise previously to the grant, provided that was necessary for the useful operation of the mill." The authorities cited by defendants are to the same effect. "Property conveyed passes with all the incidents then rightfully belonging to it, *or actually or usually enjoyed with it at the time of the conveyance,* so far as they are necessary to the full benefit and perfect enjoyment of the property, without any specifications of them." *Dunklee v. Wilton Railway Co.,* 24 N. H., 489; Tiedeman Real Prop., sec. 842. It appears from the deeds and the testimony that Tate and his associates, prior to 8 April, 1884, had erected a dam over the river and built a mill. This dam is referred to by Fichte, defendants' witness, as the "old Tate dam," thus showing that, at the time Hooper purchased (1884) and conveyed to the power company (1894), there was a dam across the river, which did not back water on the Bissell land. It further appears that Tate acquired and conveyed to Hooper certain water rights adjoining the Bissell land. The defendants, however, contend that the Bissell deed "shows that it was bought for the Mountain Island property, and that the privilege therein was conveyed for the Mountain Island water power to back water upon the same." The deed, after describing the property by metes and bounds, contains the following covenant: "It is expressly covenanted and agreed that the said W. T. Jordan shall have all water rights and privileges on said premises, and shall have the right to erect a dam or dams in the said river for the purpose of taking up and utiliz-

ing the full fall in said river embraced in the said boundaries, and shall not be liable for any resultant damages to any of the lands of the parties of the first part or anyone claiming under them, provided the dam or dams or other obstruction may be placed in said river at what is designated in the plat hereto annexed as the 'lower bench mark,' or at any other place; and provided that the said dam or obstruction, wherever placed, shall not raise the water at said lower bench mark more than four and a half feet above the iron peg in the rock, the iron peg being the lower bench mark and located at the upper end or just above the upper end of the Rumfelt Island." We find nothing in this language indicating that it has any connection with or relation to the Mountain Island property. The evident purpose of the grantor was to give to the grantees certain defined water rights in respect to other lands, limiting such right to four and one-half feet at the lower bench mark. The defendants contended that this mark was on the Tate land. His Honor submitted the question to the jury and they found against defendants. The covenant is expressly confined to dams which may be placed in the river on the lands "within said boundaries." There is no evidence that Mrs. Bissell knew that Jordan was purchasing for Hooper. We concur with his Honor that no easement to flood or back water upon the Bissell land passed to the power company by Hooper's deed, for the twofold reason that he had no title to or estate in the land at the time of the conveyance, and that his deed expressly confines the water rights to those conveyed in the deed from Tate to himself. "A right or easement does not pass as appurtenant without mention, unless it is an existing easement actually appurtenant by use and occupation at the time of the conveyance. It must actually belong to the estate conveyed in order to pass by implication." Jones Easements, sec. 25. Defendants, however, insist that, conceding that no easement passed by Hooper's deed when Jordan conveyed the Bissell land to the electric and power com-

pany in 1900, the rights to back water upon it thus acquired inured to the benefit of the Fidelity and Deposit Company, the trustee. It is unquestionably true that, when property is mortgaged and, after the execution of the mortgage, an easement is acquired necessary and essential to the full enjoyment of the property, it will inure to the benefit of the mortgagee. *Swedish, etc., Bank v. Insurance Co.,* 83 Minn., 377. The deed from Jordan to the power company expressly confined its operation to the limitation contained in the deed from Bissell to him. Of course, no easement passed to the power company because the land itself covered by water was conveyed. The power company could not own the land and easement therein at the same time. When it acquired the land, of course, it had the right to subject it to any use which it saw proper, subject to the rights of the adjoining owners. If it had, after acquiring the title, raised the dam on the Mountain Island, and thereby backed water over the Bissell property, thus subjecting it to a burden, it may be that, upon a sale of the property by the deposit company, the purchaser would have taken title with the easement, as was held in *Whitehead v. Garris,* 48 N. C., 171. The fact is, however, that on 29 May, 1900, Jordan conveyed to the power company, and at that time it is not claimed that the power company had acquired an easement otherwise than by the Hooper deed, and on 4 February, 1901, the power company, for a valuable consideration, conveyed the same properties to Barbour. The deed contains this language: "It is the purpose of the said parties of the first part, by this deed, to invest the said party of the second part with the title to all the lands, water rights and easements acquired by the said parties of the first part, under the aforesaid deeds, and reference is made to these said deeds for a more particular description of the lands, water rights and easements hereby conveyed." The deed refers to the deed from Jordan, and, as we have seen, he conveyed only the water rights which he acquired from Bissell. Barbour,

therefore, took the title to the Bissell property free from any burden or easement to back water upon it. No easement was ever granted by Jordan, the holder of the legal title, or Hooper, who had the equity or right to call for it, and none could be otherwise acquired against them, except by adverse user for twenty years. There is no evidence that Latta had any knowledge of the fact that Jordan held subject to any right in Hooper to call for the legal title. It is true that the dam had been extended and, at the time Latta purchased, backed water on the Bissell land, but it does not appear how long it had done so; it could not have exceeded seven years. The Electric and Power Company held the Bissell property in the same plight and subject to the same easements, and none other, expressly conferred by the deed from Bissell to Jordan. The deed to the Fidelity and Deposit Company conveyed such rights as the power company had, and no more. The mere fact that the power company, five years thereafter, acquired the Bissell land did not prevent it from conveying it to a purchaser for value in the same plight and condition as it was conveyed to said company. We, therefore, concur with his Honor in holding that the defendant Manufacturing and Electric Power Company did not acquire an easement to erect and maintain a dam of sufficient height to back water upon the Bissell land.

The Lineberger and Sample lands lie two miles up the river and consist largely of land covered by water. Their chief value consists in their water power and rights. On 28 March, 1899, Jordan, by direction of Hooper, purchased them and paid the purchase money by drafts on the Hooper Manufacturing Company. The jury find that they were not purchased for the Catawba Electric and Power Company. Jordan held them until 1900, when, by direction of Hooper, he conveyed them, together with the Bissell property, to the power company. There is no suggestion that the Mountain Island dam has backed water upon them. We can see no

reason why the same conclusion reached in regard to the Bissell land does not apply to these properties.    We concur with his Honor's ruling in regard to them.

The defendants, other than the power company and the Fidelity and Deposit Company, claim that the deed from the Electric and Power Company to Barbour was invalid, for that at the time it was executed the company was insolvent; that the consideration was a pre-existing debt due Barbour, endorsed by Hooper; that Hooper was president and Barbour a director in said corporation.    Plaintiff denies all of these averments, except that Barbour was a director, and for further defense alleges that he purchased for full value and without notice of any of the facts relied upon to invalidate the deed of 4 February, 1901.    His Honor submitted the following issue: "Was the Catawba Electric and Power Company insolvent in the months of January and February, 1901?" The defendants requested the court to instruct the jury to answer the issue, upon the evidence, in the affirmative.    This was refused, and defendants excepted.    Under the instructions given, the jury answered the issue in the negative.    The exception presents the question whether the uncontradicted testimony showed that the corporation was insolvent at the date of the deed to Barbour.    It appears that, on 1 May, 1895, the deed in trust was executed to the Fidelity and Deposit Company to secure sixty-five coupon bonds, known as "Class A."    These bonds were issued and sold for cash. There is no controversy in regard to their validity.    The same deed secured eighty-six coupon bonds known as "Class B." The bonds included in "Class A" were given priority of lien in said deed.    The plaintiff contends that the bonds in "Class B" were never issued and sold to *bona fide* holders, and that no money was received by the company from them.    When the Mountain Island property was sold, 11 September, 1901, by the Fidelity and Deposit Company to Theodore Hooper and others for $175,000, the court directed the Clerk to give

notice for the bondholders to file their bonds and to report to the court the amount of the indebtedness and interest on account of them.   From the report made by the Clerk it appears that the bonds described as "Class A," with accumulated interest, amounted to $88,844 on 15 February, 1902, the date of the report; deducting two years' interest, $7,800, they amounted, on 4 February, 1901, to $81,044.   It is conceded that the corporation owed Barbour $80,000.   If the eighty-six bonds, "Class B," constituted a valid indebtedness, the corporation was, on 4 February, 1901, insolvent; otherwise it was solvent.   The plaintiff insists that the defendants, Theodore Hooper and others, do not allege that they are creditors.   An inspection of the answer, setting up the counterclaim, does not disclose very clearly an allegation that the defendants are creditors, but, as the cause was tried by his Honor upon the assumption that the pleadings raised the issue, we will so treat them.   The burden of proof was upon the defendants to show that the company was insolvent, and that they, as creditors, are in a position to attack the deed to Barbour.   The plaintiff insists that the defendants have failed in both respects.   No bonds were produced on the trial. The only witness examined in regard to the eighty-six bonds was defendant Alcæus Hooper.   He says that the bonds in "Class A" were paid for in cash; of this he has personal knowledge.   In regard to "Class B," he says: "So (far) as I remember correctly, the history of the second mortgage bonds was, that Mr. William J. Hooper owed to my father, at the time of his death, a certain amount of money, and the trustees, in settling father's estate, received from W. J. Hooper, of 'Class B,' eighty-six bonds.   How he got them I do not remember.   I think you will find what I am now telling you is substantially correct.   I paid no money for these bonds ('Class B'), except in the way of crediting him on account of indebtedness to my father's estate."

W. T. Jordan, the secretary and treasurer, testified that, so

far as he knew, the company got no money from these bonds. The other evidence relating to insolvency of the company in February, 1901, was conflicting. Alcæus Hooper says that it was insolvent. Jordan says that, eliminating the debt to Barbour, the company was solvent, if it could get $200,000 for its property. If this is correct, eliminating the eighty-six bonds ("Class B"), the same result would follow, including the Barbour debt. The defendants insist that the judgment in the suit brought by the Fidelity and Deposit Company fixed the validity of the bonds and the insolvency of the company. We do not perceive how, as against the plaintiff, the judgment in that action is relevant. Barbour's deed was executed 4 February, 1901. The summons in that action was issued 24 June, 1901. Barbour was not a party to the action. The answer was filed, admitting the indebtedness by W. J. Hooper, president. It was, of course, to his interest to fix upon the company the eighty-six bonds delivered by him to the trustees of his father's estate to pay his indebtedness. His acts and declarations subsequent to the date of Barbour's deed are not competent to invalidate the deed, nor could the judgment in that suit affect Barbour or his grantee. Defendants say, however that may be, plaintiff, by making the record in that case a part of his reply to the counterclaim, is estopped from denying the truth of the facts adjudicated therein. We do not perceive how this result follows. In making the record a part of his pleadings, plaintiff can add nothing to nor take anything from its force and effect. We do not perceive any good reason for his doing so, nor do we think he thereby in any manner changed his relation to the record. Defendants also insist that plaintiff, as agent for Barbour, filed with the Clerk in that suit proof of claim for nine of the bonds in "Class B," and that he thus recognized their validity. They also call attention to the fact that plaintiff made a contract with Barbour to buy these nine bonds. All of this was competent as acts and declarations of plaintiff and his grantor prior to the

146—20

conveyance to him, but we do not see that they have any element of an estoppel. It does not appear that these acts and declarations were made to anyone for the purpose of buying the bonds, or that anyone did buy or in any manner deal with them by reason of such acts and declarations. Defendants further insist that, taking the testimony of Alcæus Hooper as true, it does not show that the company did not receive value for the bonds; that the company may have owed money to Hooper; that, a short time before the bonds were issued, it purchased the Mountain Island Mills from W. J. Hooper, and that it may have owed him the purchase price. These were all matters for the jury upon the issue of insolvency. The burden was on the defendants to show that the company was insolvent at the date of Barbour's deed; and the court could not, in the light of the fact that no bonds were produced (no one of the defendants who claimed to be creditors testified in regard to the alleged debts, except Alcæus Hooper, who gives an account of the manner in which he came into possession of the bonds), have directed the jury to answer the issue in the affirmative. His Honor left the question to the jury, under instructions, whether the bonds were a valid indebtedness of the company. In the light of the testimony of Alcæus Hooper in regard to the receipt of the bonds for the individual indebtedness of W. J. Hooper, the president of the company, it was encumbent upon the defendants to show, either that W. J. Hooper paid value to the company for them or that they were purchasers for value and without notice of any defect in them by reason of Hooper's using them to pay his debts. Defendants insist that no issue was raised by the pleadings in regard to the validity of the eighty-six bonds. The issue of insolvency involved the question of indebtedness and assets. How otherwise could that issue be decided? The only way in which the financial condition of a person or corporation can be ascertained is to fix the amount of its valid indebtedness and its available assets. We have examined the entire charge upon this issue, and the exceptions thereto, and

find no error therein. The question was fairly left to the jury. The verdict upon this issue renders it unnecessary to pass upon the exceptions to his Honor's ruling and instructions upon those relating to notice. The plaintiff testified that he did not know at the time of his purchase that Barbour was one of the directors of the power company. He says: "I paid Colonel Barbour in full for the property in controversy about $7,220, and he delivered the deeds to me which have been exhibited here. At the time the money was paid, and at the time the deeds were delivered to me, I did not know or have any notice that Colonel Barbour was a director or officer of the Catawba Electric Company." He says that he learned it in 1903. He further says that at the time he took the deeds he did not know anything of its financial condition, except that it owed Colonel Barbour a great deal of money. The jury found with the plaintiff in regard to notice, etc. It is not necessary nor practicable to discuss each of the exceptions to the record. We have, however, examined them. The exception to his Honor's ruling upon the issues tendered by defendants cannot be sustained. The issues submitted clearly present the controverted question of fact.

The defendants assign as error the refusal of the court to exclude certain depositions. The facts in regard to them are: The depositions were taken upon notice and duly returned by the commissioner to the Clerk, who issued notice, on 8 May, 1905, that he would open them on 10 May, 1905, at 10 o'clock A. M. Service of the notice was accepted by counsel 9 May, 1905. On 10 May, in accordance with the notice, the Clerk opened the depositions, passed upon, and allowed them, pursuant to Revisal, sec. 1357. On 15 May, 1905, the defendants filed exceptions to the Clerk's order, for that (1st) they were opened without notice; (2d) they were opened on a legal holiday. The defendants appealed to the Judge holding the courts of the district, etc. The Clerk certified the record made by him to the Judge, showing that on 10 May, 1905, pursuant to

notice, in the presence of one of plaintiff's attorneys, no one being present representing defendants, he opened and allowed the depositions. The Judge held that the notice was insufficient, and reversed the Clerk's order. Defendants thereupon moved that the depositions be quashed. This motion was refused. The Judge thereupon made an order "allowing the defendants until Thursday morning in which to file exceptions to said depositions. It is now ordered that the depositions of William Barbour, J. N. Steele and A. R. Turner, Jr., now on file in the Clerk's office of this court, in this case, be and are hereby allowed, and said depositions are adjudged to be legal evidence." Defendants excepted. Upon the trial his Honor admitted the depositions, and defendants excepted. The exception is based upon the proposition that the notice that the depositions would be opened on a legal holiday was a nullity, and that the action of the Clerk was invalid. The learned counsel who argued this exception based the conclusion to which he invited the court upon the proposition that a legal holiday has the same status in respect to legal proceedings as Sunday. If he is correct in this, the conclusion is irresistible that the depositions could not lawfully be opened on 10 May, it being a legal holiday. Revisal, sec. 2838. This Court held, in *Sloan v. Williford,* 25 N. C., 307, that a deposition taken on Sunday should be rejected. Without pursuing the discussion as to whether the deposition could be lawfully opened on Sunday, it is sufficient to say that a legal holiday is not, in this respect, *dies non juridicus.* The statute simply declares that 10 May and other days named are "public holidays." In *Glenn v. Eddy,* 51 N. J. L., 255 (14 Am. St. Rep., 684), *Magie, J.,* discussing the question, says: "The statutory declaration that these days shall be legal holidays does not indicate an intent to assimilate their status to that of Sunday. 'Holiday,' in its present conventional meaning, is scarcely applicable to Sunday. * * * When the statute declares them to be legal holidays, it does not permit a refer-

ence to the legal *status* of Sunday to discover its meaning." The universally accepted principle is that what the statute fails to prohibit may be done. *Pain v. Shainwald,* 169 N. Y., 246; 21 Cyc., 442. If defendant's contention is correct, that they could not be compelled to attend on 10 May, the statute provides that they would have been entitled to file exceptions and have a hearing on the next succeeding day. They failed to attend on either day. We find nothing in the statute prohibiting the opening of depositions on legal holidays, and we would not be justified in writing it therein. It is well known that the courts of this State frequently sit and transact business on the several public holidays. It appears that defendant's counsel were present and cross-examined the witnesses. Again, *Judge Justice,* in passing upon the appeal from the Clerk, gave the defendants time and opportunity to file exceptions. We are of the opinion that his Honor properly allowed the depositions to be read.

The defendants noted an exception to the order of *Judge Allen* permitting the Electric and Power Company to file an answer. This answer was filed at September Term, 1904. It seems that Colonel Barbour was the owner of a majority of the stock of the Electric and Power Company, and that A. R. Turner, Jr., was elected its president, succeeding W. J. Hooper. The corporation was made party defendant in this action, and, if it had any existence, we can see no good reason why it should not file an answer. Of course, its answer did not affect defendants' rights. The case was brought and tried upon the theory that the Catawba Electric and Power Company was a going concern—an existing corporate entity. If this is correct, it is not easy to see how Alcæus Hooper and the other defendants were in a position to litigate the counterclaim. If Hooper, as president, had fraudulently disposed of the property of the corporation to Barbour, it was the duty of the officers of the corporation to sue for and recover it for the benefit of its creditors. If they refused to do so, the creditors might, upon proper

allegation and proof, have had a receiver appointed, who would sue for the property and bring it into court, to be applied to the debts. It is evident, from the answer of Turner, president, that new and antagonistic forces had come into control of the corporation. The Hooper interest was supplanted. We think, by virtue of sections 697 and 698 of The Code of 1883, then in force, the sale of the property, franchises, etc., of the Catawba Electric and Power Company, under the decree of the court, dissolved the corporation. If, during its existence, its officers had fraudulently or unlawfully disposed of any of its property, the creditors were entitled to have a receiver appointed to sue for and recover such property. *Coal and Ice Co. v. Railway,* 144 N. C., 732. The parties having litigated all of the questions which would be open to a receiver, and the cause having, at much expense, been tried upon its merits, we have discussed and decided the questions presented upon the record, and only call attention to the effect of the statute to show that we have not overlooked it. It is evident that the controversy involves valuable property rights, upon which industrial development is dependent.

After a careful examination of the record, aided by full and exhaustive briefs, we find no reversible error. It must be so certified.

No Error.