## TRUST CO. OF AMERICA v. CITY OF RHINELANDER, WIS.

(Circuit Court, W. D. Wisconsin. October 4, 1910.)

No. 22.

1. CORPORATIONS (§ 478\*)—MORTGAGES—CONSTRUCTION AND OPERATION—AFTER-ACQUIRED PROPERTY CLAUSE.

An after-acquired property clause in a corporation mortgage is sustainable in equity only as a contract to mortgage the future acquired property and enforcing the mortgage against such property is substantially enforcing specific performance of the contract; and, as the mortgagor could not expressly contract to mortgage the after-acquired property of others, such property acquired by its successor in interest cannot be brought within the mortgage by the force of such contract alone unaided by the rule of accession, estoppel, or some other equitable consideration.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 1871; Dec. Dig. § 478;\* Mortgages, Cent. Dig. § 255.]

2. WATERS AND WATER COURSES (§ 188\*)—WATER COMPANIES—MORTGAGES.

Under the law of Wisconsin, a franchise granted to a water company by a city to build and operate a waterworks system therein is regarded as the principal thing to which the other property acquired by the company real or personal is an incident; the whole being personalty so long as owned by the company. But, where such a company conveys all of its plant, property, and rights to the city, the franchise lapses or is suspended by the merger, and the property in the hands of the city becomes realty, the land owned in fee for power station, etc., being the principal thing to which the easements acquired by the laying of pipes in the streets are appurtenant; and, in such case, extensions of the pipe lines made by the city and the additional easements thereby acquired are accessions to the corporeal property which, in the absence of any countervailing equity, pass under a general mortgage given by the water company before the transfer, and which expressly undertook to pledge the whole plant and future additions as an entirety.

[Ed. Note.—For other cases, see Waters and Water Courses, Dec. Dig. § 188.\*]

3. WATERS AND WATER COURSES (§ 188\*) — ACQUISITION OF PLANT OF WATER COMPANY BY CITY—ESTOPPEL TO DENY VALIDITY OF BONDS.

The conduct of a city in recognizing the validity of bonds issued by a water company whose plant it had acquired in an agreement of division of property and debts with the town, and in continuing for many years to pay hydrant rentals under its contract with the company which had been assigned to the mortgage trustee, including those on hydrants which it

---

\*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

had itself placed on extensions, *held* to estop it to deny the validity of the bonds, or that the mortgage securing the same covered such extensions.

[Ed. Note.—For other cases, see Waters and Water Courses, Dec. Dig. § 188.*]

In Equity. Suit by the Trust Company of America against the City of Rhinelander, Wis. Decree for complainant.

Sam S. Miller (Olin & Butler, of counsel), for complainant.
George G. Greene and H. F. Steele, City Atty., for defendant.

SANBORN, District Judge. · The complainant, a New York corporation, on the 11th day of July, 1908, filed its bill of complaint against the defendant, a Wisconsin municipal corporation, for the foreclosure of a trust deed given by Rhinelander Water Company on September 1, 1890, to Holland Trust Company, a New York corporation, and the predecessor in trust of the complainant, which trust deed secured the payment of an authorized issue of $100,000 of the bonds of the water company, of which $83,000 have been in fact issued and are outstanding. The defendant seasonably filed its answer, in which it sets up numerous alleged defenses to the validity of the bonds, and also denies its obligation for the payment of the hydrant rentals, and asserts that the trust deed does not cover any extensions or improvements made by the defendant city, though the answer admits that the city, as a condition of retaining the property, should be required to pay the reasonable value of so much of the plant as was installed by the water company, and the answer in express terms states:

"That in no event will defendant permit an enforced sale of said plant, but will before sale pay such amount as the court determines it legally or equitably ought to pay to redeem from said trust deed."

On June 23, 1890, the town of Pelican, out of which the defendant city was afterward carved, adopted an ordinance, attached to the bill as Exhibit A, which ordinance was duly accepted by the grantees on June 25, 1890, and authorized the grantees, Moffet, Hodgkins & Clarke, their representatives and assigns, to construct, maintain, and operate waterworks in and adjacent to the village of Rhinelander in said town of Pelican. This ordinance contained a contract by the town to pay rentals for the use of the hydrants originally installed, and also for those subsequently added, at certain prescribed rates, for a period of 30 years from the time of installation. Following the adoption of this ordinance, and on August 19, 1890, Rhinelander Water Company was organized with an authorized capital stock of $100,000, nearly all of such stock being subscribed for by Moffett, Hodgkins & Clarke. Thereupon, at a meeting of the stockholders and directors held on September 1, 1890, the ordinance was transferred to the water company for the sum of $50,000, payable in the stock of the company. At the same meeting Moffett, Hodgkins & Clarke made a proposition to the water company for the construction of the waterworks according to the ordinance, and to certain plans and specifications then presented, they to receive for such construction $65,000 of the first-mortgage 6

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

per cent. bonds of the company and $50,000, or the remaining par, of the capital stock of the company. And on the same day a contract was entered into for the construction of the works upon this basis. Thereupon the stockholders authorized the bonds and trust deed here in question, and the same were accordingly made and executed by the water company under date of September 1, 1890, though not delivered until about September 15, 1890, on which date the trust deed was recorded. On September 16, 1890, the trustee released to the water company $65,000 of the bonds, pursuant to the provisions of the trust deed. The waterworks were completed in all respects in accordance with the ordinance and plans and specifications, and were duly accepted by the town of Pelican on January 13, 1891. On October 12, 1891, the trustee released $10,000 of the extension bonds which had been reserved pursuant to the trust deed. On November 23, 1891, it released $5,000 more of the extension bonds, and on March 28, 1892, it released $3,000 more of the extension bonds, so that, in addition to the original issue of $65,000, there have been issued $18,000 of the extension or improvement bonds, making the total outstanding issue $83,000. The bonds are now in the hands of some 43 different owners, in comparatively small amounts, all of whom are bona fide purchasers for value; they having paid approximately par for their bonds. The hydrant rentals provided for in the ordinance were assigned to the trustee by the terms of the trust deed, and later, and on January 19, 1891, a separate assignment thereof was made to the trustee. Moffett, Hodgkins & Clarke transferred their stock in the water company to Mr. Calkins, who had previously been the superintendent of the works, and to Judge Barnes, Mr. Lewis, Mr. Chafee, and Messrs. A. W. and E. O. Brown, and thereafter Moffett, Hodgkins & Clarke Company, which succeeded the firm, had no interest in the corporation, excepting that for a time they owned some of its bonds. The consideration paid by the Rhinelander parties for the stock was $5,000. On September 9, 1893, in consideration of $5,000, the water company quitclaimed its rights in the waterworks, franchises, and revenues, "excepting assigned rentals," to the town of Pelican. On March 20, 1894, the defendant city was organized under the general charter law of the state, out of the territory of the town, and a settlement was had between the town and the city, whereby the city received the waterworks plant at the price of $5,000, the terms of the settlement being shown in the proof, and hereafter referred to. Following the acquisition of the property by the town, and later by the city, they, respectively, paid the interest on the bonds, the same being usually paid in the form of hydrant rentals, pursuant to the terms of the trust deed, and the assignment of such rentals to the trustee, such interest being paid up to the 1st of September, 1906, since which time neither interest nor hydrant rentals have been paid, the hydrant rental payments only extending up to and including those which became due July 1, 1906. The water company in or about the month of March, 1907, having failed to comply with the provisions of section 1774a, Wis. St., was pursuant to that law declared to be dissolved. During all the period following the acquisition of the property by the city in 1894, and up to the time it defaulted in the payment of interest or hydrant rentals, the city, not only by the payment of the

hydrant rentals, but by repeated action of its common council and officers, recognized the existence and validity of the bonds to the full amount of $83,000.

The important and difficult question presented is whether extensions and improvements to the water plant made by the city wherein the mortgagor never had any interest shall be taken to pay the bonds. From May 1, 1894, when the city bought the plant, it has laid over seven miles of pipes, which have cost, with hydrants and other improvements, about $49,000. Counsel for the city contending that the mortgage debt was illegal and fraudulent urges that the city may equitably claim to retain what it has installed and paid for against the bondholders. It never became liable for the debt, the utmost extent of its obligation being to pay hydrant rentals on such hydrants as had been put in when it became owner. Further it is urged, even if the bonds be found fully valid, in respect to the effect of the after-acquired property clause upon the extensions: (1) If the clause is valid, it could only include property acquired by the mortgagor. (2) By the law of Wisconsin it is not valid. (3) In terms it covers only property acquired by the mortgagor. (4) Extensions by the city are not subject to the mortgage by accession, because the waterworks franchise is personal property, as well as the mains and hydrants. The right to use the streets for mains, hydrants, and service pipes is at most an easement appurtenant to the ownership of the land on which is located the pumping station. The doctrine of accession has no application to property of the nature mentioned. (5) There is nothing in the proofs which makes it inequitable for the city to contend that additions made and paid for by it are not within the mortgage. (6) The city's contentions do not make it necessary to divide the plant, simply sell it as a whole, value the old and new parts, and give each party its proper share. It becomes necessary in order to appreciate the force of these claims to state the facts more fully.

The resolution of the water company of June 23, 1890, authorizing the bonds and mortgage, contained inter alia the following, in respect to after-acquired property:

"For the purpose of securing the payment of said bonds and interest coupons and the sums of money therein named at the maturity thereof, the president (or vice president) and secretary of this company be, and they are hereby, authorized and directed to cause to be prepared a proper deed of trust or mortgage, and to execute and duly acknowledge the same according to the laws of the state of Wisconsin, and deliver the same, conveying to said Holland Trust Company, and its successors and assigns forever in trust, the aforesaid waterworks, lands, mains, pipes, buildings, franchises, easements, rights, and privileges, rents, revenues, incomes, extensions, improvements, additions, and property of every kind, name, and description of said water company, now held or that shall or may be hereafter constructed, acquired or held, together with all and singular the hereditaments and appurtenances thereto belonging, or in any wise appertaining as a first mortgage, free and clear of all other liens and incumbrances, which mortgage or deed of trust shall contain the proper provisions and recitals to carry into effect the object of these resolutions."

The trust deed, after reciting the aforementioned resolution, and that the trust deed was made in pursuance thereof, contained the following provision as to after-acquired property:

"Together with all and singular the rights of way, lands, pump house and site, reservoir and site, pumping machinery, boilers, tools, furniture and fixtures, pipes, mains, wells, cribs, hydrants, gates and valves, the water rents and income, rents, revenues, extensions, additions, improvements, franchise and property of every name, kind and description of said water company, which it now has or owns, and which it may hereafter own or acquire; together with all and singular the hereditaments and appurtenances thereto belonging, or in any way appertaining, to have and to hold the same forever to the said party of the second part or its successors in office for the sole and only proper use, benefit, and behoof of the Holland Trust Company, trustee, or its successors in trust."

The ordinance granted by the town of Pelican to Moffett, Hodgkins & Clarke, contained the following:

"The said town of Pelican promises and agrees to pay as rent for the said fire protection, the sum of thirty-six hundred dollars ($3,600) per annum for the term of thirty years, the sum of eighteen hundred dollars ($1,800) to be paid on the first days of January and July in each and every year, during the said term to the said grantees or their assigns, and in further consideration of the payment of all taxes by said town upon the waterworks plant for the period of three years. A sufficient tax shall be levied and collected on all the taxable property in the town, subject by law to such tax, to meet the payments under this ordinance, as they may respectively mature during the existence of any contract for public fire service, which tax shall be irrepealable from and after the passage of this ordinance, and in case the town board shall be authorized to levy a special tax for such purpose, such tax shall be annually levied, and the proceeds thereof shall be kept as a separate fund, to be known as the fire hydrant fund, and shall be irrevocably and exclusively devoted to the payment of hydrant rentals under this ordinance and it shall not be otherwise employed. The town board of the town of Pelican may at any time require the said grantees to make extensions of the pipe system of said waterworks by giving sixty days' notice at any proper time of the year, and may order hydrants placed on such extensions at not less than twelve to the mile, and the said town agrees to pay a rental on such extensions for fire protection, at the rate of forty dollars per hydrant per year for the term of thirty years from the time of making such extension, said sum to be paid in equal installments on the first days of January and July of each year for the uncompleted term of thirty years."

The evidence shows that no substantial part of the waterworks had been constructed when the trust deed was given. The deed included a clause giving the power of sale in case of default, covering the property and franchises conveyed "or intended so to be"; also, that the trustee might in that event take possession of the whole plant, and use, operate, and manage it for the benefit of the bondholders. A further provision authorized the appointment of a receiver without notice. The intention of all the parties then interested, the town, water company, and mortgagee, is clear, not only that the plant was expected to be a growing concern, but to give and maintain ample security to the bondholders. The trust deed was intended to be as broad as the resolution authorizing it, as ample as it could be made in regard to after-acquired property. The franchise granted was the chief thing, the property, real or personal, being in Wisconsin regarded as an incident to it, and the whole thus being personal property so long as held by the water company. The whole plant and franchise thus became a unit, whose parts were legally inseparable, all taking their legal status and pattern from the franchise. It is clear that the mortgagor intended (whatever may have been legally possible) to include all additions and

extensions, no matter by whom made, in the mortgage security. This is confirmed by the fact that the plant, as originally built, was adapted to a larger water supply than was then necessary.

Before stating the facts bearing upon the city's right to equitably claim its part of the plant free from the mortgage, it seems convenient to examine the first four points, relating to the after-acquired property clause, and the law as to accession. Such clauses are sustainable in equity only as contracts to mortgage the future acquired property. Enforcing the mortgage against it is substantially enforcing specific performance. Beall v. White, 94 U. S. 382, 24 L. Ed. 173; Metropolitan Nat. Bank v. St. Louis Despatch Co, 149 U S. 436, 13. Sup. Ct. 944, 37 L. Ed. 799; Mallory v. Glass Co. (C. C.) 131 Fed. 111. As the mortgagor could not expressly contract to mortgage the after-acquired property of others, such property can never come within the mortgage by the force of such a contract alone, unaided by the rule of accession, estoppel, or some other equitable consideration. Lorain Steel Co. v. Norfolk & B. St. R. Co., 187 Mass. 500, 73 N. E. 646; N. Y. S. & T. Co. v. Louisville, E. & St. L. Consol. R. Co. (C. C.) 102 Fed. 398; Harris v. Bridge Co., 90 Fed. 328, 33 C. C. A. 69; Venner v. Farmers' L. & T. Co., 90 Fed. 355, 33 C. C. A. 95; Bear Lake Irr. Co. v. Garland, 164 U. S. 1, 21, 17 Sup. Ct. 7, 41 L. Ed. 327. In Wisconsin, until changed by statute, the rule applicable to property other than public utilities was that after-acquired property clauses in mortgages were void, even in equity, unless the mortgagor, after acquiring the property, subjected it to the mortgage by some new act. Chynoweth v. Tenney, 10 Wis. 397; O'Niel v Kerr Co., 124 Wis. 234, 102 N. W. 573, 70 L. R. A. 338. After the mortgage in the present case was made, the Legislature, by the act of 1893 (section 1780, St. 1898), changed this rule as to waterworks mortgages. It may be fairly concluded, therefore, that the extensions are not within the mortgage by force of the after-acquired property clause alone, apart from any consideration of accession, estoppel of the city, or other equitable consideration precluding it from claiming immunity.

The question of accession presents considerable difficulty. It is a well-understood rule that whatever is affixed to real property becomes an inseparable part of it, and belongs to its owner. In the present instance the city, owning the whole plant, has a fee-simple title to the power station. This is real property. It has also an easement in the streets for maintaining the mains, hydrants, and service pipes. Louisville T. Co. v. Cincinnati, 76 Fed. 296, 22 C. C. A. 334; Wright v. Railway Co., 95 Wis. 35, 69 N. W. 791, 36 L. R. A. 47, 60 Am. St. Rep. 74. This also is real estate, a typical example of jus in re aliena. The franchise no longer exists or is in abeyance because destroyed by merger. A municipal corporation has no franchise to operate a water plant. It grants franchises to private corporations for the purpose, but needs none itself, having statutory power to that end. Waterworks franchises are personal property when held by corporations other than the municipality itself. The whole property is therefore real estate, corporeal and incorporeal, power station and easements. When the city extends the system by laying pipe in some additional street, it acquires a perpetual easement over the land owned by the

abutting lot owners for the maintenance of the system. To what land is such easement appurtenant? Necessarily to the central station. Logically, therefore, there can be no objection to applying the ordinary rule of accession to all the additions. It is not necessary to go so far as to say that, if the city should acquire an addition to the land used as the power station, such act would subject the new purchase to the old mortgage, unless the added parcel was absolutely necessary to the use of the plant. Swedish, etc., Bank v. Connecticut, etc., Co., 83 Minn. 377, 86 N. W. 420. That question is not presented. The new land would not be appurtenant to the old in the usual case. It would be similar to the case of a farmer whose farm is mortgaged adding a new 40. But suppose the farmer obtains a right of way over his neighbor's land for the benefit of his own, would not the mortgagee take it on foreclosure as an appurtenance? An affirmative answer is given in Latta v. Catawba El. & Power Co., 146 N. C. 285, 59 S. E. 1028. If not, it would become extinguished, and the servient estate freed from it. I am unable to see why the technical rule of accession does not apply to these extensions on the theory that, as the easements are successively added, they become inseparably appurtenant to the corporeal hereditament, the power station, unless some supervening equity prevents.

On the question of equity just suggested, as well as whether the city is in a position to claim that the additions are not within the mortgage, and whether it is estopped from so claiming, some further reference to the record is necessary. The circumstances of the city's acquiring the plant and its subsequent conduct are as follows:

By section 944, St. Wis. 1898, it was provided that:

"Whenever any municipality shall incur any indebtedness by the issue of bonds or municipal obligations, all the territory embraced within the limits of such municipality shall remain liable to the payment thereof, until such bonds or obligations are fully paid; and if any such territory shall be set off or taken therefrom after such indebtedness is incurred, and no other provision shall have been made by or according to law, for the apportionment and collection of such indebtedness, the county board of the county in which such territory is situated shall annually apportion to all such territory so set off or taken from any such municipality, a pro rata portion of the amount of tax necessary to be raised in such year for the payment of principal and interest [on the basis of the taxable property of the territory which is set off as regards that remaining]."

Subdivision 2, § 960g, S. & B. Ann. St. 1889, provides:

"When any territory shall be detached from any county, town, city, village, or school district in this state, and the same shall be annexed to any other county, town, city, village or school district therein, or any new county, town, city, village or school district shall be in whole or in part created from such territory so detached, the county, town, village, city or school district to which the same shall be annexed, or which shall be in whole or in part detached therefrom, shall be liable to the county, town, village, city or school district from which the territory was so detached for its just share of the liabilities and indebtedness, and shall receive the just share of the credits from the county, town, village, city or school district from which the same shall have been detached, which shall be apportioned by ascertaining which ratio the portion detached bears to the territory from which the same was detached, and the last prior assessment shall be used as the basis in determining the same."

It is apparent from the provisions of said section 944 that all the territory in the town, including that which afterward became a part of the city, remained liable, as between the trustee and the town, for the payment of the hydrant rentals, for the reason that the town had obligated itself to pay the rentals, and the right to the rentals had been assigned to the trustee, both by the trust deed and by the instrument of January 19, 1891, which was assented to by the town, and therefore, when the city was carved out of the town, there was a subsisting obligation of the town in favor of the trustee, which, under the terms of the statute, could not be impaired by the setting off of a part of the territory of the town into the city. It is apparent, moreover, from said section 944 that, if no settlement had been made between the town and the city under the provisions of said section 960g, the obligation for the payment of the rentals would annually have been apportioned by the county board between the town and the city; the territory of each bearing its proportion upon the ratio of assessed valuation. We thus see that a situation was presented where, as between the town, the city, and the trustee, neither the town nor city could be relieved of the obligations to the trustee on account of the hydrant rentals, and, moreover, that the obligation must as between the town and the city be adjusted from year to year by the county board, or the town and city must proceed under said section 960g, to apportion the assets and liabilities so that each would receive a certain part of the assets, and assume a certain part of the obligations, and thus be relieved from the burden of an annual adjustment by the county board of the share of the accruing obligations which each should pay. Under this situation, the town and the city entered into the settlement of date March 20, 1894, the same being made, as is recited therein, pursuant to subdivision 2 of said section 960g. By the terms of the settlement, it is determined that, on the basis of the assessed valuation of the territory set off into the city as compared with the assessed valuation of the remaining territory of the town, the city was entitled to 65½ per cent. of the assets of the town and should pay 65½ per cent. of its obligations. The property which the city should take is listed, and the prices of each item agreed upon, and it is provided that the city shall take the same at such prices. Among such property is the "waterworks plant" at the price of $5,000. The property which the town shall take and the agreed price thereof is also listed. It is then determined that the town "owed the Holland Trust Company for back interest on waterworks bonds," and accrued interest from March 1st to March 20th, a certain amount, the same representing the balance of interest unpaid at the time of the organization of the city on the whole $83,000 of bonds. "This indebtedness the city assumes and agrees to pay the Holland Trust Company." The net result of the settlement is determined by charging the city with the difference between the value of the property it received at the agreed prices thereof and 65½ per cent. of the agreed value of the whole of the property, and deducting therefrom 34½ per cent. of the amount of the bond interest obligation which the city thus agreed to wholly pay.

It is also provided by section 263, c. 326, Laws 1889, by section 925—263, St. Wis. 1898, that:

"Whenever a city or village shall be incorporated under the provisions of this chapter the ordinances in force therein at the time of such incorporation shall continue to be in force and be the ordinances of such new corporation so far the same are not inconsistent with the provisions of this chapter, until amended, altered or repealed."

And by chapter 361, § 1, Laws 1897, being section 959—48, St. Wis. 1898, the power and duty of taxation by villages and cities are provided for to pay water rents stipulated in the ordinance. This provision manifestly applies to ordinances adopted before its passage. Appleton W. W. Co. v. Appleton, 132 Wis. 563, 113 N. W. 44. The fact that the city is now itself pumping the water through the pipes and hydrants does not relieve it from whatever obligation it may have assumed to pay rentals in favor of the bondholders because it uses in doing so the pipes and hydrants pledged to them (assuming they were so pledged). On the question of the legal effect of a municipality acquiring a plant for which it has agreed to pay rent, see Centerville v. Fidelity T. & G. Co., 118 Fed. 332, 55 C. C. A. 348; Fidelity T. & G. Co. v. Fowler W. Co. (C. C.) 113 Fed. 560; Illinois, etc., Bank v. Arkansas City, 76 Fed. 271, 22 C. C. A. 171, 34 L. R. A. 518; Omaha W. Co. v. Omaha, 147 Fed. 1, 77 C. C. A. 267, 12 L. R. A. (N. S.) 736. The city was the legal successor of the town in respect to all its territory, including the waterworks, and took the place of the town in respect to all its obligations relating to them. It could not take the benefit of the works without assuming a burden to which they were subject. Illinois, etc., Bank v. Arkansas City, supra; Fergus Falls W. Co. v. Fergus Falls (C. C.) 65 Fed. 586.

The debt for water rental was recognized by the city from its organization in 1894 to July 1, 1906. On September 4, 1894, the common council of the city adopted a motion that the city pay the trust company "for water rentals and back interest." On March 19, 1895, the common council adopted the following resolution:

"Resolved, by the common council of the city of Rhinelander, that the city treasurer is instructed to pay interest on the city bonds as the coupons shall become due and be presented and that the treasurer be instructed to pay the interest coupons of the Rhinelander waterworks bonds as the same shall become due and be presented to him for payment. Resolved further that the city clerk is instructed to notify the Holland Trust Company that the city will, in the future, pay the interest coupons on said bonds directly, and that he furnish the Holland Trust Company a certified copy of this resolution."

Pursuant to the terms of the above resolution, a certified copy thereof was sent to the trustee on March 20, 1895. In addition to the above, there appear several motions and resolutions adopted by the common council between 1895 and 1906, directing the payment of "hydrant rentals" to pay "coupons."

In addition to this, it appears that from the time the city acquired possession of the property up to 1906 it paid the hydrant rentals so far as required to cover the interest on the bonds, such payments being sometimes made upon bills filed by the said city treasurer who was superintendent of the waterworks, for "water rentals" or "hydrant rentals" remitted by him to the trustee, and at other times such payments being made upon bills filed in the name of the trustee for "hydrant rentals," all of which bills were duly audited and allowed by the

common council, and all of which recognized that the payment is for hydrant rentals to the extent of the interest, and that the obligation for the payment thereof had been assigned to the trustee. It further appears that prior to the resignation of Holland Trust Company as trustee in 1903, during which time the hydrant rentals due from the city were not sufficient to pay the interest, the remainder of the interest had been paid by the railroad companies and other consumers whose contracts had been assigned to the trustee directly to the trustee. When the city made its first payment of hydrant rentals, the city clerk on September 7, 1894, wrote the trust company as follows:

"I am instructed to say to you that the city is of the opinion that all contracts assigned to your company should be canceled and the city of Rhinelander collect all rentals and remit to your company as you can readily see this will prevent all complications in the future. Please receipt and advise us of your opinion of the assigned rentals."

In reply to this the trustee on September 11, 1894, wrote to the city clerk as follows:

"We have your favor of the 7 inst., inclosing draft for $2,634.09, in payment of water rentals to date. The same we have this day credited to the Rhinelander Water Company coupons account. In regard to the assignment of the water rentals to the city, we would say that we will have to comply strictly to the terms of the agreement whereby the Rhinelander Water Company shall assign and transfer all rentals to Holland Trust Company, trustee, and we will be unable to cancel our contracts and assign them to the city."

It was because of the fact that the trustee did not feel itself authorized by the trust deed to turn over to the city any of the contracts for the payment of rentals by other consumers that the city thereafter for a number of years paid to the trustee the rentals due from the city, sufficient being collected by the trustee from other consumers whose contracts had been assigned to it to pay the remainder of the interest. After the resignation of the Holland Trust Company, however, when the hydrant rentals had by extensions to the system made by the city itself been increased, the city appears to have paid rentals to the full amount of the interest each six months, and to have collected and retained all rentals due from private consumers, even though the contracts for the payment thereof had been assigned to the trustee. While these payments were being made the bonds were passing from one owner to another. It is claimed that this continued recognition on the part of the city of an obligation to pay rentals stipulated for, including those on hydrants installed by it, together with the manifest intention of the mortgagor to pledge the whole plant and additions as an entirety, of which the city had notice, place it in a position where it cannot in equity take the ground that the mortgage does not cover extensions and additions made at its own expense, even though such additions and extensions are not technically within the lien held by the trustee.

In view of all the circumstances, I am convinced that the city ought not to be allowed to take the position that the additions made by it are not within the mortgage, or that the bonds are void. In view of the manifest intent of the mortgagor to subject additions to the lien, the agreement of the city to pay rentals, and its continued payment of such

rentals while the bonds were changing hands, it ought not to be heard to make these contentions. Venner v. Farmers' L. & T. Co., 90 Fed. 348, 33 C. C. A. 95; Compton v. Jesup, 68 Fed. 263, 15 C. C. A. 397.

Certain other questions are presented, respecting the validity of the franchise ordinance, and of the original and extension bonds. At the time the town of Pelican purchased the waterworks Rhinelander was an unincorporated village of more than 1,000 inhabitants, situated in the town. This fact made applicable the provisions of chapter 292, § 1, Laws Wis. 1883, being section 819a, S. & B. Ann. St. 1889, as follows:

"All powers relating to villages and conferred upon village boards by the provisions of chapter 40 of the Revised Statutes, and all acts amendatory thereof, excepting those the exercise of which would conflict with the provisions of law relating to towns and town boards, are hereby conferred upon towns and town boards of towns containing one or more unincorporated villages, having each a population of not less than one thousand inhabitants, and are made applicable to such unincorporated village or villages, and may be exercised therein when directed by a resolution of the qualified electors of the town, at the last preceding annual town meeting."

The provisions of the incorporated village act made applicable by the foregoing statute are as follows:

"To provide protection from fire * * * by the erection or construction of pumps, water mains, reservoirs or other waterworks." Subdivision 10, § 892, St. 1898.

Also:

"To construct and maintain waterworks for the supply of water to the inhabitants of the village." Subdivision 29, § 892, supra.

It is provided by section 1753, St. Wis. 1898, that:

"No corporation shall issue any * * * bonds or other evidences of indebtedness except for money, labor or property estimated at its true money value, actually received by it, equal to seventy-five per cent. of the par value thereof."

"All stock and bonds issued contrary to the provisions of this section shall be void."

If the bonds in question are within this section and their validity were to be determined by the law of Wisconsin, they are void even in the hands of bona fide holders. First Av. L. Co. v. Parker, 111 Wis. 1, 86 N. W. 604, 87 Am. St. Rep. 841; Telephone Co. v. Evansville (C. C.) 127 Fed. 187. But see Haynes v. Kenosha Co., 139 Wis. 227, 119 N. W. 568, 121 N. W. 124. I find, however, as a matter of fact that the whole issue of $83,000 bonds were issued for more than 75 per cent. of their face, and were not therefore within the quoted statute, in such a way as to affect the validity of the bonds when held bona fide.

The ordinance granting the waterworks franchise to individuals, instead of a corporation, was void by the terms of section 1780a, St. Wis. 1898, in force when the franchise was granted, and which limited the grant of such franchises to corporations alone. But by a curative act (chapter 251, § 1, Laws 1903; section 1862a, Sanborn's St. Supp. 1906), the invalidity was cured. This statute provides that all grants and franchises theretofore made to or conferred upon individuals by any village or city to purchase, construct, or maintain water-

works, etc., are validated, legalized, confirmed, and approved in all cases where such persons have transferred such grants to a corporation, and the works have been constructed. The town of Pelican was in law a village, so far as it exercised village powers, a legal entity acting as a village, and within the curative statute. Hurley W. Co. v. Vaughn, 115 Wis. 470, 91 N. W. 971. It is therefore not necessary to consider the effect a void ordinance might have had upon the waterworks contract, or the acquisition of the plant by the town and city, followed by the payment of rentals for a long time.

The city, having assumed to pay hydrant rentals in the agreement of division with the town, and the new hydrants being as fully within the mortgage as the old, should be decreed to pay so much of such rentals as may be necessary to discharge accrued interest on the bonds. By an order in this suit made November 14, 1908, the appointment of a receiver was directed, unless the city should by ordinance set aside the sum of $15,600 for rentals from January 1, 1907, to July 1, 1909, to be kept as a separate fund until final decree. The city thereafter passed such an ordinance. On July 1, 1910, there was due an additional $5,200 for such rentals. The continuing obligation to pay these rentals should also be decreed.

In respect to water rents collected from private consumers: The resolution of the water company authorizing the mortgage authorized the pledge of all rents, revenues, and incomes. But the mortgage itself, in conveying rights, contains the following:

"Rents and income, rents, revenues * * * which it now has or owns, or which it may hereafter own or acquire."

I assume it would at this date be impossible to separate income existing when the town bought the plant from income arising later. I think it is consistent with the view I take of the law applying to the case that all income now existing was pledged by the mortgage, and should be decreed paid on the mortgage debt. In the order of November 28, 1908, the lien of the trustee upon net income was made to attach as effectually as though a receiver had been appointed November 16, 1908, and the decree should provide for an account of such income from November 16, 1908, to the time of redemption or sale, as the case may be.

The sale should be under the statute relating to mortgage foreclosures or by analogy thereto. It is unnecessary to decide whether the statute applies because the sale should in any event conform thereto. The city will undoubtedly redeem, and should be given ample time to raise the necessary funds. This may involve a popular election, negotiation of bonds, etc. While the franchise granted by the town to Moffett, Hodgkins & Clarke, and transferred to the water company, is merged by the uniting of all interests in the city, this is, of course, subject to the mortgage, and as to them there would be no merger. The city holds no franchise, only a waterworks plant, clearly real estate. But the sale must be of the mortgaged property, including the franchise.

Under the public utilities law (chapter 499, Laws 1907) water companies having pre-existing franchises may surrender them prior to

January 1, 1911, and take a franchise indeterminate as to time, and subject to the right of the municipality to purchase at any time, at a price fixed by the Railroad Commission. Probably the time fixed will be again extended by the Legislature of 1911. It would not be possible, in any event, to have a sale and conveyance within the three months now remaining. An appeal will undoubtedly be taken in view of the sum involved, and the difficulty of the questions presented. This would delay final adjustment for another year or more.

Other provisions of the decree, including a possible allowance to the trustee, should be postponed until application for decree is made; but complainant should have costs.